IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

| | |
|---|---|
| DEMARCUS GREELY | 23-1978 |
| OMARION BRANCH | 23-2042 |
| TOREZ ZARON BURNETT, | 23-2050 |

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Western District of Michigan
No. 1:22-CR-137

---

# CONSOLIDATED BRIEF FOR APPELLEE

---

MARK A. TOTTEN
*United States Attorney*

JOHN J. SCHOETTLE
*Assistant United States Attorney*
Post Office Box 208
Grand Rapids, Michigan 49501-0208
(616) 456-2404

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

STATEMENT REGARDING ORAL ARGUMENT ........ xv

STATEMENT OF JURISDICTION ........ 1

ISSUES PRESENTED ........ 2

STATEMENT OF THE CASE ........ 3

I. Demarcus Greely ........ 3

A. Factual background ........ 3

B. Procedural background ........ 4

II. Omarion Branch ........ 6

A. Factual background ........ 6

B. Procedural background ........ 7

III. Torez Burnett ........ 9

A. Factual background ........ 9

B. Procedural background ........ 11

SUMMARY OF THE ARGUMENT ........ 18

ARGUMENT ........ 23

I. Section 922(o) Does Not Violate the Second Amendment. ........ 23

A. Standard of review ........ 23

B. Legal background ........ 23

C. Supreme Court and Sixth Circuit precedent foreclose Greely's constitutional challenge. ........ 25

D. Section 922(o) is constitutional under the Second Amendment's text and this Nation's historical tradition. .......... 29

II. Section 922(g)(1) Does Not Violate the Second Amendment.......... 44

A. Standard of review .......... 44

B. Legal background .......... 44

C. Section 922(g)(1) is constitutional under Sixth Circuit precedent. .......... 50

III. The District Court's Sentence of Burnett was Proper and Reasonable. .......... 53

A. Standard of review .......... 53

B. Burnett waived his Second-Amendment challenge or invited the error he now claims. .......... 57

C. The district court's application of the prohibited-person base offense level was not plain error. .......... 58

D. The Court should decline to review Burnett's procedural-reasonableness challenge. .......... 78

E. The district court accurately understood Burnett's part in the offense and considered mitigating arguments. .......... 80

F. Burnett's sentence was substantively reasonable .......... 83

CONCLUSION .......... 85

CERTIFICATE OF SERVICE .......... 86

CERTIFICATE OF COMPLIANCE .......... 87

DESIGNATION OF DISTRICT COURT DOCUMENTS .......... 88

**TABLE OF AUTHORITIES**

Pages

**Cases**

*Barrett v. United States*,
423 U.S. 212 (1976) ........ 65

*Bevis v. City of Naperville, Illinois*,
85 F.4th 1175 (7th Cir. 2023) ........ 28, 29, 35, 38

*Bianchi v. Brown*,
111 F.4th 438 (4th Cir. 2024) ........ passim

*Caetano v. Massachusetts*,
577 U.S. 411 (2016) ........ 28, 29, 37

*Dickerson v. New Banner Inst., Inc.*,
460 U.S. 103 (1983) ........ 66

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ........ passim

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) ........ 38

*Gall v. United States*,
552 U.S. 38 (2007) ........ 53, 54, 55

*Hamblen v. United States*,
591 F.3d 471 (6th Cir. 2009) ........ 5, 26

*Harmelin v. Michigan*,
501 U.S. 957 (1991) ........ 65, 74

*Hollis v. Lynch*,
827 F.3d 436 (5th Cir. 2016) ........ 31, 36, 42

*In re Rogers*,
66 P.2d 1237 (Cal. Dist. Ct. App. 1937) ........ 71

*Kolbe v. Hogan*,
813 F.3d 160 (4th Cir. 2016), *vacated on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017) .......... 37

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) .......... 74, 75

*National Treasury Employees Union v. Von Raab*,
489 U.S. 656 (1989) .......... 66

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
804 F.3d 242 (2d Cir. 2015) .......... 37

*New York State Rifle & Pistol Association v. Bruen*,
597 U.S. 1 (2022) .......... passim

*Ocean State Tactical, LLC v. Rhode Island*,
95 F.4th 38 (1st Cir. 2024) .......... 40

*Rita v. United States*,
551 U.S. 338 (2007) .......... 54

*Robinson v. California*,
370 U.S. 660 (1962) .......... 75

*Smith v. United States*,
508 U.S. 223 (1993) .......... 64

*Staples v. United States*,
511 U.S. 600 (1994) .......... 33

*State v. Shelby*,
2 S.W. 468 (Mo. 1886) .......... 70

*United States v. Akridge*,
62 F.4th 258 (6th Cir. 2023) .......... 56, 57, 79

*United States v. Alaniz*,
69 F.4th 1124 (9th Cir. 2023) .......... 71

*United States v. Berger*,
No. 5:22-CR-00033, -- F. Supp. 3d --, 2024 WL 449247 (E.D. Pa. Feb. 6, 2024) ........ 35, 40

*United States v. Bolds*,
511 F.3d 568 (6th Cir. 2007) ........ 55

*United States v. Bowens*,
938 F.3d 790 (6th Cir. 2019) ........ 73

*United States v. Carey*,
602 F.3d 738 (6th Cir. 2010) ........ 45

*United States v. Carter*,
89 F.4th 565 (6th Cir. 2023) ........ passim

*United States v. Carter*,
750 F.3d 462 (4th Cir. 2014) ........ 66, 74

*United States v. Claybrooks*,
90 F.4th 248 (4th Cir. 2024) ........ 59, 60

*United States v. Connelly*,
No. 23-50312, -- F.4th --, 2024 WL 3963874 (5th Cir. Aug. 28, 2024) 72

*United States v. Cooperman*,
No. 22-CR-146, 2023 WL 4762710 (N.D. Ill. July 26, 2023) ........ 42

*United States v. Daniels*,
77 F.4th 337 (5th Cir. 2023) ........ 72

*United States v. Derringer*,
844 F. App'x 802 (6th Cir. 2021) ........ 56

*United States v. Dubois*,
94 F.4th 1284 (11th Cir. 2024) ........ 47

*United States v. Dugan*,
657 F.3d 998 (9th Cir. 2011) ........ 76

*United States v. Ferguson*,
868 F.3d 514 (6th Cir. 2017) ........ 26

*United States v. Frazier*,
314 F. App'x 801 (6th Cir. 2008) .......... 45

*United States v. Frei*,
995 F.3d 561 (6th Cir. 2021) .......... 54

*United States v. Gay*,
98 F.4th 843 (7th Cir. 2024) .......... 47, 52

*United States v. Hall*,
373 F. App'x 588 (6th Cir. 2010) .......... 56, 57

*United States v. Hazel*,
696 F.2d 473 (6th Cir. 1983) .......... 43

*United States v. Henry*,
688 F.3d 637 (9th Cir. 2012) .......... 31

*United States v. Jackson*,
110 F.4th 1120 (8th Cir. 2024) .......... 48

*United States v. Jackson*,
995 F.3d 476 (6th Cir. 2021) .......... 56

*United States v. Johns*,
65 F.4th 891 (6th Cir. 2023) .......... 54, 81, 85

*United States v. Johnson*,
95 F.4th 404 (6th Cir. 2024) .......... 59

*United States v. Langston*,
110 F.4th 408 (1st Cir. 2024) .......... 47

*United States v. Lowe*,
No. 22-13251, 2024 WL 3649527 (11th Cir. Aug. 5, 2024) .......... 47

*United States v. Miller*,
307 U.S. 174 (1939) .......... 5, 30, 69

*United States v. Moore*,
111 F.4th 266 (3d Cir. 2024) .......... 52

*United States v. Moya*,
No. 22-40714, 2024 WL 3723900 (5th Cir. Aug. 8, 2024) .................... 47

*United States v. O'Brien*,
560 U.S. 218 (2010) .................... 35

*United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*,
822 F.3d 136 (3d Cir. 2016) .................... 39

*United States v. Potts*,
947 F.3d 357 (6th Cir. 2020) .................... 53

*United States v. Price*,
111 F.4th 392 (4th Cir. 2024) .................... 30

*United States v. Rahimi*,
144 S. Ct. 1889 (2024) .................... passim

*United States v. Ramadan*,
No. 22-1243, 2023 WL 6634293 (6th Cir. Oct. 12, 2023) .................... 60

*United States v. Ramirez-Figueredo*,
33 F.4th 312 (6th Cir. 2022) .................... 55

*United States v. Rayyan*,
885 F.3d 436 (6th Cir. 2018) .................... 54

*United States v. Rose*,
522 F.3d 710 (6th Cir. 2008) .................... 23, 44

*United States v. Schock*,
862 F.3d 563 (6th Cir. 2017) .................... 55

*United States v. Simien*,
655 F. Supp. 3d 540 (W.D. Tex. 2023) .................... 42

*United States v. Skoien*,
614 F.3d 638 (7th Cir. 2010) .................... 61

*United States v. Thompson/Ctr. Arms Co.*,
504 U.S. 505 (1992) .................... 33

*United States v. Veasley*,
98 F.4th 906 (8th Cir. 2024) .......... 75, 76

*United States v. Vonner*,
516 F.3d 382 (6th Cir. 2008) .......... 54, 55, 56

*United States v. Watkins*,
815 F. App'x 22 (6th Cir. 2020) .......... 43

*United States v. West*,
962 F.3d 183 (6th Cir. 2020) .......... 84

*United States v. Williams*,
113 F.4th 637 (6th Cir. 2024) .......... passim

*United States v. Yancey*,
621 F.3d 681 (7th Cir. 2010) .......... 71, 73, 74, 76

*Vincent v. Garland*,
80 F.4th 1197 (10th Cir. 2023), *vacated*, No. 23-683, 2024 WL 3259668 (Mem.) .......... 47

**Statutes**

1 Acts and Resolves of the Province of Massachusetts Bay 52–53 (1869) .......... 64

5 Acts and Resolves, Public and Private, of the Province of Massachusetts Bay 480 (1886) .......... 63

8 The Statutes at Large of Pennsylvania from 1682-1801, at 559-561 (1902) .......... 63

11 R.I. Gen. Laws § 11-47-8(a) .......... 33

18 Pa. Stat. § 908 .......... 33

18 U.S.C. § 371 .......... 4, 11

18 U.S.C. § 922(d)(3) .......... 59

18 U.S.C. § 922(g)(3) .......... passim

18 U.S.C. § 922(g)(8) .......... 59

18 U.S.C. § 922(o) .......... passim

18 U.S.C. § 3231 .......... 1

18 U.S.C. § 3553(a) .......... 15, 54

18 U.S.C. § 3742(a) .......... 1

18 USC § 922(g)(1) .......... 7, 20

26 U.S.C. § 5845(a) .......... 11

28 U.S.C. § 1291 .......... 1

36 Okla. L. Rev. 65 (1983) .......... 75

720 Ill. Comp. Stat. 5/24-1(a)(7)(i) .......... 33

1878 Miss. Laws 175-176 § 2 .......... 69

1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals .......... 69

1909 Id. Sess. Laws 6 .......... 69

1931 Pa. Laws 499, no. 158, § 8 .......... 71

1935 S.D. Sess. Laws 356 .......... 71

1935 Wash. Sess. Laws 601, ch. 172, § 8 .......... 71

1936 Ala. Laws 52, no. 82, § 8 .......... 71

Act of Dec. 1775, The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive 193 (Charles J. Hoadly ed., 1890) .......... 63

Act of Feb. 16, 1787, §§ 1-3, 1 Private and Special Statutes of the Commonwealth of Massachusetts 145-147 (1805) .......... 63

Act of Nov. 27, 1786, ch. 21, A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force 33 (1794) .......... 64

Act of the General Assembly of the State of New-Jersey 90 (1777) .......... 63

Alaska Stat. § 11.61.200 .......... 33

Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(iii), 13-3102(A)(5) .......... 33

Cal. Penal Code § 32625(a) .......... 33

Colo. Rev. Stat. § 18-12-102 .......... 33

D.C. Code § 22-4514(a) .......... 33

Del. Code tit. 11, § 1444(a)(5) .......... 33

Fla. Stat. § 790.221(1) .......... 33

Ga. Code Ann. § 16-11-122 .......... 33, 34

Haw. Rev. Stat. § 134-8(a) .......... 33

Ind. Code § 35-47-5-8 .......... 33

Iowa Code §§ 724.1(1)(a) .......... 33

Kan. Sess. Laws 25, ch. 12 § 1(1867) .......... 69

Kan. Stat. Ann. § 21-6301(a)(5) .......... 33

La. Stat. Ann. § 40:1752 .......... 33, 34

Mass. Gen. Laws ch. 140, §§ 128, 131, 131M .......... 33

Me. Rev. Stat. Ann. tit. 17-A, § 1051(1) .......... 33

Mich. Comp. Laws § 750.224(1)(a) .......... 33

Minn. Stat. § 609.67 .......... 33

Mo. Ann. Stat. § 571.020(1)(6) .......... 34

Mo. Ann. Stat. § 571.020(6)(a) .......... 33

Mo. Rev. Stat. § 1274 (1879) .......... 69

N.C. Gen. Stat. § 14-409(b) .......... 33

N.D. Cent. Code § 62.1-05-01(1) .......... 33

N.J. Stat. Ann. §§ 2C:39-5(a),2C:58-5 .......... 33

N.Y. Penal Law § 265.02(3) .......... 33

Neb. Rev. Stat. § 28-1203(1) .......... 33

Nev. Rev. Stat. § 202.350(1)(b) .......... 33

Ohio Rev. Code Ann. §§ 2923.11(K), 2923.17 .......... 33

Or. Rev. Stat. § 166.272 .......... 33

S.C. Code Ann. § 16-23-230 .......... 33

S.D. Codified Laws §§ 22-1-2, 22-14-6 .......... 33

Tenn. Code Ann. § 39-17-1302(a)(3) .......... 33

Tex. Penal Code Ann. § 46.05(a)(1)(B) .......... 33

W. Va. Code § 61-7-9 .......... 34

Wash. Rev. Code § 9.41.190(1)(a) .......... 33

Wis. Stat. § 941.26 .......... 34

**Rules**

U.S.S.G. § 2K2.1(a)(4)(B) .......... 12, 53, 78

**Regulations**

87 Fed. Reg. 24652, 24655 (Apr. 26, 2022) .......... 31

**Other Authorities**

1 Blackstone's Commentaries 145–146 (1803) ........................................ 40

1 Laws of New Hampshire 679 (Albert Stillman Batchellor ed., 1904). 64

1 William Waller Hening, Statutes at Large, Being a Collection of All the Laws of Virginia 401-02 (1823) ................................................ 68

2 Arthur Vollmer, U.S. Selective Serv. Sys., Military Obligation: The American Tradition, pt. 8, New Jersey, at 25–26 (1947) ..................... 68

2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971) ........................................................................................ 62

4 Journals of the Continental Congress 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776) ........................................ 63

7 Records of the Colony of Rhode Island and Providence Plantations in New England 567 (John Russell Bartlett ed., 1862) ........................... 63

9 The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, at 282 (William Waller Hening ed., 1821) ................................................ 63

24 The State Records of North Carolina 89 (Walter Clark ed., 1905) ... 63

132 Cong. Rec. 9600 (1986) .................................................................. 32

Carlton F.W. Larson, Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit, 60 Hastings L. J. 1371 (2009) .......................................................... 75

David B. Kopel & Joseph G.S. Greenless, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223 (2024) ........................................ 32

David F. Musto, Drugs in America: A Documentary History 183, 188–92 (NYU 2002) ........................................................................... 70

Eliphalet Ladd, Burn's Abridgement, Or The American Justice 22-24 (2d ed. 1792) (N.H.) ........................................................................ 64

Elizabeth Kelly Gray, Habit Forming: Drug Addiction in America, 1776-1914 25 (2023) .......... 70

Erik Grant Luna, *Our Vietnam: The Prohibition Apocalypse*, 46 DePaul L. Rev. 483 (1997) .......... 70

H.R. Rep. No. 83-1337 (1954) .......... 32

H.R. Rep. No. 99-495 (1986) .......... 33

James Davis, The Office and Authority of a Justice of Peace 5 (1774) (N.C.) .......... 64

James Parker, Conductor Generalis 11 (Robert Campbell printing 1792) (Pa.) .......... 64

James Parker, Conductor Generalis 12 (1764) (N.J.) .......... 64

James Parker, Conductor Generalis 12 (Robert Hodge printing 1788) (N.Y.) .......... 64

John Rublowsky, The Stoned Age: A History of Drugs in America 98 (1974) .......... 70

Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*,133 Yale L.J. 99 (2023) .......... 40

Joseph Greenleaf, An Abridgment of Burn's Justice of the Peace and Parish Officer 12–13 (1773) (Mass.) .......... 64

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130–32 (1994) .......... 62

Richard J. Bonnie & Charles H. Whitebread, II, The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition, 56 Va. L. Rev. 971 (1970) .......... 71

Robert J. Spitzer, *Understanding Gun Law History After Buren: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57 (2023) .......... 32

S. Rep. No. 73-1444 (1934) ..................................................... 32, 35

S. Rep. No. 90-1501 (1968) ..................................................... 31

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004) ..................................................... 69

Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 28–29 (1868) ..................................................... 62

William Waller Hening, The New Virginia Justice 18 (1795) (Va.) ....... 64

## STATEMENT REGARDING ORAL ARGUMENT

The United States requests oral argument. Some of the questions presented in this appeal have been much-debated and, to the government's knowledge, have not yet been squarely addressed by this Court. Oral argument may therefore assist the Court's consideration of those questions.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 18 U.S.C. § 3231 because the Defendants-Appellants—Demarcus Greely, Omarion Branch, and Torez Zaron Burnett—were all charged with federal crimes. The district court entered a final judgment of conviction and sentence for: (1) Greely on October 31, 2023 (R.453); (2) Branch on November 14, 2023 (R.476); and (3) Burnett on November 16, 2023 (R.485). Greely filed a notice of appeal on October 31, 2023. (R.456.) Branch filed a notice of appeal on November 21, 2023. (R.489.) Burnett filed a notice of appeal on November 30, 2023. (R.503.) This Court has appellate jurisdiction to review their convictions under 28 U.S.C. § 1291; its authority to grant Appellants relief from their sentences is set forth in 18 U.S.C. § 3742(a).

## ISSUES PRESENTED

1. Whether the federal prohibition on machinegun possession violates the Second Amendment?

2. Whether the federal prohibition on firearm possession by felons violates the Second Amendment?

3. Whether the district court plainly erred in applying to Burnett the base offense level for prohibited persons illegally possessing firearms where he admitted to being a daily marijuana user and was recorded possessing a firearm while using?

4. Whether the district court abused its discretion in sentencing Burnett at the bottom of his guideline range?

## STATEMENT OF THE CASE

Demarcus Greely, Omarion Branch, and Torez Burnett were charged with firearms offenses as part of a law enforcement investigation into a conspiracy to obtain and distribute conversion devices to gang members and others throughout Benton Harbor, Michigan and the Western District of Michigan. These switches converted semiautomatic pistols into fully automatic machineguns, capable of indiscriminately spraying hundreds of rounds of ammunition per minute. All pled guilty to violating federal firearms laws and now raise various challenges to their convictions and sentences.

### I. Demarcus Greely

#### A. Factual background

Greely was affiliated with a violent street gang in Benton Harbor, Michigan, called My Brother's Keeper ("MBK"). (R.389: Greely PSR, PageID.1854.) In 2021, a rival gang called "36" shot and killed Greely's brother, a known affiliate of MBK. (*Id.*, PageID.1857.) About a week later, the home of a 36 member was shot about 70 times, apparently by MBK members, and a three-year-old girl was hit and injured. (*Id.*)

In March 2022, Torez Burnett and Greely arranged by Facebook for Greely to purchase an unserialized Polymer P80 pistol and magazine for $750. (*Id.*, PageID.1861, 1864.) In June 2022, police seized that gun from Greely's waistband during a traffic stop, and saw it was equipped with a switch. (*Id.*, PageID.1864.) On Greely's Facebook, there were several pictures and videos of Greely making gang symbols and holding guns, including the one he was arrested with. (*Id.*) On the day the ghost gun was seized from him, Greely wrote on Facebook, "I Got Caught Wit A Switch Bro." (*Id.*, PageID.1865.)

**B. Procedural background**

On October 4, 2022, Greely was charged in a single-count indictment alleging he unlawfully possessed a machinegun in violation of 18 U.S.C. § 922(o). (R.1: Ind., PageID.1.) On January 10, 2023, a grand jury charged Greely and nine others in a superseding indictment. (R.30: Sup. Ind.) Greely was charged in the superseding indictment with conspiring to possess and transfer machineguns and possessing and transferring a machinegun in violation of 18 U.S.C. §§ 371, 922(o).

On April 3, 2023, Greely filed a motion to dismiss both charges as facially unconstitutional under the Second Amendment. (R.208: Mot.

Dismiss; R.209: Br.) Greely argued that the Second Amendment protected his right to possess a machinegun because machineguns were not dangerous and unusual weapons. (R:209: Br., PageID.728.) Greely alternatively asked for the court to set an evidentiary hearing if the court found an evidentiary dispute on the question. (*Id.*, PageID.733.) The government argued in response that (1) the Second Amendment's plain text does not guarantee a right to possess machineguns and (2) machineguns are dangerous and unusual weapons, the possession of which may be banned consistent with this Nation's historical tradition. (R.214: Gov't Resp.)

The district court denied Greely's motion on the ground that the Second Amendment does not create a right to possess machineguns. (R.244: Order.) The court explained that the Supreme Court limited the types of firearms protected by the Second Amendment in *United States v. Miller*, 307 U.S. 174 (1939). The court also relied on the Supreme Court's statement in *District of Columbia v. Heller*, 554 U.S. 570 (2008) that it would be "startling" to think that the Second Amendment protected machineguns. The district court further recognized that it was bound by this Court's subsequent decision in *Hamblen v. United States*,

591 F.3d 471 (6th Cir. 2009), rejecting a Second Amendment challenge to 18 U.S.C. § 922(o). The court also concluded that even if *Hamblen* were not binding, machineguns remain dangerous and unusual weapons. (R.244: Order, PageID.917.) The district court determined that it did not need an evidentiary hearing. (*Id.*, PageID.918.)

Greely subsequently pled guilty to possessing and transferring a machinegun, but he reserved through a plea agreement his right to appeal the district court's denial of his motion to dismiss. (R.266: Greely Plea Agmt.; R.267: R&R.) The court sentenced Greely to 30 months' imprisonment on October 30, 2023, and entered a written judgment the next day. (R.451: Mins.; R.453: Jgmt.) Greely filed a notice of appeal on October 31, 2023. (R.456: Not. App.)

## II. Omarion Branch

### A. Factual background

In 2021, Branch was convicted of and sentenced for selling a firearm to a felon, carrying a concealed weapon, and assault with a dangerous weapon. (R.429: Branch PSR, PageID.2271.) Following his release from prison, Branch was placed on probation and equipped with an ankle monitor. (*Id.*, PageID.2262.) In March 2022, Branch removed his ankle

monitor and absconded from probation. (*Id.*) About two months later, officers responded to a shooting at a home in Benton Harbor, and found on the ground in front of the house: a Ruger P95 pistol, a phone, and a fast food receipt with Branch's name. (*Id.*) A witness told officers that Branch was at the house visiting his girlfriend, bullets started to spray the residence, and Branch appeared to return fire. (*Id.*) In September 2022, Branch was found in Indiana and extradited to Michigan. (*Id.*) He told officers he got the pistol for protection and had been hit in front of the residence. (*Id.*)

### B. Procedural background

Branch was charged in the superseding indictment with unlawfully possessing a firearm as a felon in violation of 18 USC § 922(g)(1). (R.30: Sup. Ind., PageID.123.) On March 2, 2023, Branch filed a motion to dismiss that charge, arguing that § 922(g)(1) violated the Second Amendment. (R.182: Mot. Dismiss.) Branch claimed that his conduct fell within the text of the Second Amendment because felons are included among the "people," and he possessed the firearm for self-defense. He also argued that disarming a felon is unsupported by any historical tradition. The government argued in response that the Second Amendment does

not protect felons possessing firearms, and even if it did, prohibiting firearm possession by felons is consistent with this nation's historical tradition of firearm regulation. (R.184: Gov't Resp.)

The district court denied Branch's motion. (R.243: Order.) The court first noted that Branch had prior state felony convictions for (1) selling a firearm to a prohibited person, (2) carrying a concealed weapon, and (3) assault with a dangerous weapon. (*Id.*, PageID.907–08.) The district court determined that felons do not have a right to bear arms under the Second Amendment. (*Id.*, PageID.910.) The district court further concluded that even if the Second Amendment covered felons, there was a historical tradition supporting disarming persons whose actions evidence a disrespect for the rule of law. (*Id.*) As a result, the district court concluded that the government "met its burden to show that the disbarment of individuals convicted of violent crimes is deeply rooted in this Nation's history." (*Id.*, PageID.910.)

Branch subsequently pled guilty to the felon-in-possession charge but under a plea agreement reserved his right to appeal the court's denial of his motion to dismiss. (R.276: Plea Agmt.; R.284: Mins.) The district court sentenced Branch on November 14, 2023 to 38 months in prison for

that offense and entered a written judgment the same day. (R.475: Mins.; R.476: Jgmt.) Branch filed a notice of appeal on November 21, 2023. (R.489: Not. App.)

## III. Torez Burnett

### A. Factual background

Like Greely, Burnett was a member of My Brother's Keeper. In an October 2018 Facebook post, Burnett advertised his membership, as shown below. (R.355: Burnett PSR, PageID.1617.)




(R.359: Gov. Sent. Memo., PageID.1693.)

In another post, he wrote "#MBKGangOrDie" and "Mfs Need to Tap in." (R.355: PSR, PageID.1617.) The following month, he posted another

picture with other members of MBK, at least one of whom had a pistol, and wrote, "One False Move & Dem Killas Blam." (*Id.*)

Torez Burnett and Quincy Bowman imported switches from China. (*Id.*, PageID.1615.) Burnett then provided switches to fellow members of MBK, including codefendants Jayvon Anthony, Demarcus Greely, and Demitrius Seuell. (*Id.*) Burnett and Bowman also sold switches to other people who were apparently unaffiliated with MBK, such as codefendants Eric Williams and Omarion Branch. (*Id.*)

In December 2021, investigators found a switch in Burnett's house, along with a rifle and pistol parts; two high-capacity drum magazines; and a pistol in a state of partial disassembly that was ready to be fitted with a switch. (R.355: PSR, PageID.1618–19.) Three months later, in March 2022, investigators intercepted a package containing ten switches destined for Burnett and Bowman. (*Id.*) Shipping records showed that, in February 2022, two similar packages were delivered to Bowman's home from the same province in China. (*Id.*, PageID.1619–20.)

Even after getting caught twice, Burnett was undeterred and continued to traffic switches. On July 23, 2022, Burnett messaged Seuell, "[B]ring dem switches too so I can swap 'em." (*Id.* at PageID.1626.) Seuell

was caught with a gun and switch four days later. (*Id.*) In August 2022, Burnett was still purchasing switches for a "war":

| | |
|---|---|
| Daven: | I still got you got some metal ones coming in about to trade 20 for 10 metals |
| Burnett: | Bet just lmk |
| Burnett: | Wtw |
| Daven: | Metal ones ain't came in yet still waiting I can slide with them ones tho if u don't want to wait for them ones |
| Burnett: | Nah ima wait I'm inna war Fr |

(R.359: Gov. Sent. Memo., PageID.1695.)

### B. Procedural background

The superseding indictment charged Burnett with three counts of conspiracy to possess and transfer a machinegun, in violation of 18 U.S.C. §§ 371 and 922(o), and one count of possession and transfer of a machinegun, in violation of 18 U.S.C. § 922(o). (R.30: Sup. Ind.)

Burnett pled guilty to one count of conspiracy to possess and transfer a machinegun and one count of possession and transfer of a machinegun with a plea agreement, on May 22, 2023. (R.222: Plea Agmt.; R.229: Mins.)

The probation officer prepared a presentence report, concluding that Burnett's base offense level was 20 "because the offense involved a firearm described in 26 U.S.C. § 5845(a) and the defendant was a

prohibited person at the time he committed the instant offense, pursuant to USSG §2K2.1(a)(4)(B).” (R.355: PSR, PageID.1631.) Burnett was a “prohibited person” because he was “an unlawful user of or addicted to any controlled substance,” pursuant to 18 U.S.C. § 922(g)(3). (*Id.*, PageID.1640.)

Burnett initially objected to this assessment, arguing that (1) § 922(g)(3) is unconstitutionally overbroad and vague because “unlawful user” is not defined and the statute provides no temporal limitation between controlled substance use and firearm possession; and (2) § 922(g)(3) violates the Second Amendment under *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). (R.361: Burnett’s Obj., PageID.1714–24.)

The government argued in response that Burnett’s first point was academic because he admitted that his marijuana use and possession of the guns was contemporaneous. (R.370: Gov.’s Resp. to Burnett’s Obj., PageID.1811.) This was corroborated by a video found on Burnett’s phone showing him smoking marijuana while holding an assault rifle:

  

(*Id.* at PageID.1811.)

As to the *Bruen* challenge, the government argued that Congress could disarm persons like unlawful users who were not law-abiding, responsible citizens. (*Id.*, PageID.1812–13.) The government pointed to historical laws disarming those seen as unfit to possess firearms. (*Id.*, PageID.1813–17.)

Burnett subsequently withdrew his objection to the scoring of his base offense level. (R.508: Burnett Sent. Tr., PageID.2597.) Burnett filed a sentencing memorandum, asking the district court to vary downward and sentence him to 60 months in prison, citing his young age (21),

unstable upbringing, health problems, lack of criminal record, and remorse. (R.360: Burnett's Sent. Memo., PageID.1698–1701.)

At Burnett's sentencing on November 16, 2023, the district court confirmed that Burnett did not have any objections to the factual basis in the PSR. (R.508: Burnett Sent Tr., PageID.2596.) Burnett also informed the court that he withdrew his objection to the presentence report's base offense level calculation. (*Id.*, PageID.2597.) The district court calculated Burnett's guidelines range as 70 to 87 months. (*Id.*) Burnett's counsel told the court that Burnett "agree[d]" that the guidelines calculation was accurate. (*Id.*, PageID.2597–98.)

Burnett's attorney acknowledged the seriousness of the offense, but sought a variance due to Burnett accepting responsibility, Burnett's support from his mother, and Burnett's age. (*Id.*, PageID.2598–99.) The government in turn emphasized the seriousness of the offense and Burnett's role, explaining that Burnett "put the guns in a lot of people's hands" who in turn shot at "a number of homes and people and children . . . in Benton Harbor." (*Id.*, PageID.2600.) The government also noted that Burnett's motivation for trafficking the switches and guns was "personal profit" and "gang pride." (*Id.*, PageID.2601.) The government

highlighted that Burnett engaged in the offense despite having "far more benefits, far more family support, home support, [and] community supports" than other members of the conspiracy. (*Id.*) The government noted that Burnett's guidelines range already reflected his lack of criminal history. (*Id.*) It also explained that Burnett was undeterred after prior law enforcement interactions, continuing to sell switches and firearms even after his house was searched and guns were seized. (*Id.*, PageID.2601–02.)

The district court turned to its sentencing decision. It acknowledged the advisory nature of the guidelines and its obligation to consider the guidelines range. (*Id.*, PageID.2602.) It next considered the sentencing factors in 18 U.S.C. § 3553(a). Regarding the nature and seriousness of the offense, the court explained that compared to other members' conduct in the conspiracy, Burnett's conduct "is pretty close to the top in seriousness because he was instrumental in the importation of the devices which were used to make numerous guns into machineguns." (*Id.*, PageID.2603.) The district court noted the serious risk to the public the offense posed, not only increasing the number of guns on the street, but also making them much more dangerous. (*Id.*)

The district court next considered Burnett's history and characteristics. The district court acknowledged that Burnett was "very young." (*Id.*) The district court described Burnett as participating in "the sophisticated part of this offense by importing these devices from China." (*Id.*, PageID.2603–04.) The court found it "chilling" to consider that Burnett "start[ed] off in his criminal involvement at the age of 21 with such a serious offense." (*Id.*, PageID.2604.) The district court noted "in his favor" that Burnett obtained a GED while detained. (*Id.*)

The district court considered the purposes of sentencing, recognizing the need to provide just punishment and promote respect for the law. (*Id.*) The court sought to specifically deter Burnett and protect the public. The court next considered the need for unwarranted sentencing disparities. It recognized the sentences imposed for other members of the conspiracy, but it acknowledged that those sentences reflected the particular backgrounds and involvement in the offense of each defendant, before concluding that "I don't think that's particularly important here." (*Id.*, PageID.2604–05.)

Finally, the court responded to Burnett's arguments for a variance, including his "youth," the role gun violence played in his life, his prior

injuries from an accident, "no criminal record," and the resulting lower need for deterrence. (*Id.*, PageID.2605.) The court rejected that Burnett's involvement in the offense was a "tragic mistake," noting that it was "well thought out and carried out." (*Id.*) The court ultimately denied the variance request based on the facts of the case. (*Id.*, PageID.2606.) It imposed 60 months' imprisonment on count one and 70 months' imprisonment on count two, to be served concurrently. (*Id.*)

The court asked whether "there is any legal objection to the sentence which I have just announced; that is, any reason other than already argued by why the sentence should not be imposed as indicated?" (*Id.*, PageID.2607.) Burnett's counsel responded, "I think the Court has addressed all our arguments, and we have no objection to the sentence." (*Id.*, PageID.2607–08.) Before adjourning, the court explained that it had considered "a sentence in the middle of the advisory guidelines on count two," but nevertheless imposed a sentence at the bottom of the guidelines because of Burnett's "young age" and lack of criminal history. (*Id.*, PageID.2608.) The court entered a judgment reflecting its sentence that day. (R.485: Jgmt., PageID.2514.) Burnett filed a notice of appeal on November 30, 2023. (R.503: Not. App., PageID.2583.)

## SUMMARY OF THE ARGUMENT

*Demarcus Greely*

The federal prohibition on machinegun possession in 18 U.S.C. § 922(o) complies with the Second Amendment. Binding precedent from this Court and *Heller* requires that conclusion. Even in the absence of binding precedent, § 922(o) is constitutional. The Supreme Court has recognized for decades that the Second Amendment does not apply to every firearm. Machineguns are not bearable "arms" within the meaning of the Second Amendment's text. The type of weapon protected is limited by the Founding-era understanding that the right applied to weapons one would expect citizens to use when called for militia service. Machineguns are not such bearable "arms" because they are not typically possessed by law-abiding citizens for lawful purposes. Machineguns were developed primarily for military use, and Congress properly sought to prohibit non-military possession after recognizing that machineguns were typically possessed by lawbreakers in furtherance of unlawful behavior.

The prohibition on machinegun possession also falls comfortably within the historical tradition prohibiting the carrying of dangerous and unusual weapons. Machineguns are widely recognized as dangerous.

They are also unusual by any metric: machineguns are relatively few in number, a very small proportion of firearms owned generally, banned by the vast majority of state jurisdictions, and developed for and primarily used by the military.

Greely's arguments to the contrary are unavailing. *Bruen* cast no doubt on *Heller*'s analysis of the issue or this Court's holding that the machinegun prohibition is constitutional. Although Greely offers a bare statement that machineguns are not dangerous, he offers no reason to dispute their obvious dangerousness. Nor does he offer any basis to conclude that machineguns are not unusual. Instead, Greely relies heavily upon a two-Justice concurrence addressing a state ban on stun guns that even on its own terms does not support his argument.

Greely likewise fails to support his claim that a prohibition on possession is impermissibly broader than the traditional prohibition on carrying dangerous and unusual weapons. Greely cannot raise such a challenge because the record shows that he not only possessed a machinegun, he carried it. Moreover, Greely's argument has been rejected by other courts, impermissibly requires a historical dead ringer, and cannot be squared with the Supreme Court precedent.

Finally, the district court was not required to hold an evidentiary hearing to determine whether machineguns are dangerous and unusual. Courts have routinely found weapons to be dangerous and unusual without an evidentiary hearing. The district court did not abuse its discretion in declining to hold such a hearing.

*Omarion Branch*

The federal prohibition on the possession of firearms by felons in 18 U.S.C. § 922(g)(1) is also constitutional. The Supreme Court and this Court have consistently reaffirmed that felons may lawfully be disarmed. This Court recently determined that § 922(g)(1) is facially constitutional in light of the historical tradition allowing disarmament of dangerous people. Section 922(g)(1) is also constitutional as applied to Branch. Branch cannot show that he is not dangerous. His criminal record, including a prior offense for assault with a deadly weapon, establishes his dangerousness. Branch was also validly disarmed because he was on probation when the charged offense was committed.

*Torez Burnett*

Burnett has waived his claim that 18 U.S.C. § 922(g)(3) is unconstitutional and the district court inappropriately applied the base

offense level for a prohibited person. At the very least, Burnett invited the alleged error through his conduct at the sentencing hearing. Even if this Court were to consider his constitutional challenge, 18 U.S.C. § 922(g)(3) is not unconstitutional, let alone clearly so. There is a historical tradition in the United States of disarming persons who present a special risk of danger while possessing a firearm, such as those who have shown dangerousness and those of unsound mind like alcohol abusers and the mentally ill.

Burnett's other sentencing challenges fail. As an initial matter, the Court should decline to review Burnett's argument on appeal that the district court failed to address his arguments in favor of a lesser sentence. Burnett invited any alleged error by telling the district court affirmatively at the conclusion of the sentencing that it had addressed his arguments.

The district court's sentence was procedurally reasonable. Contrary to Burnett's contentions, the district court considered and incorporated his mitigating arguments into its sentencing decision. It also appropriately explained why the circumstances of the offense outweighed

some of the mitigating circumstances. The district court adequately explained its sentence, and it committed no error, plain or otherwise.

Burnett's sentence was also substantively reasonable. The district court explicitly considered and properly weighed the sentencing factors. The district court reasonably assigned significant weight to the circumstances of the offense. The district court accurately described Burnett as involved in the more sophisticated and serious part of the conspiracy: Burnett sourced and imported switches to distribute to gang and non-gang members, and the firearms equipped with those switches in turn were traced to local shootings. He continued to do so even after being caught by law enforcement. The district court properly found it salient that Burnett acted with planning and forethought. The district court also incorporated Burnett's age and lack of criminal history into its sentencing decision, reducing his sentence from the middle of the guidelines range to the low end.

* * *

The district court's judgments should be affirmed.

## ARGUMENT

### I. Section 922(o) Does Not Violate the Second Amendment.

The federal prohibition on machinegun possession in 18 U.S.C. § 922(o) does not unlawfully infringe on the Second Amendment right to bear arms. As the Supreme Court, this Circuit, and other courts have recognized, machineguns are not typically possessed for lawful purposes and therefore are not "bearable arms" within the scope of the Second Amendment. Even if machineguns fell within the Second Amendment's protection, there is a longstanding tradition of regulating and restricting access to such dangerous and unusual weapons.

#### A. Standard of review

Greely raised his constitutional challenge before the district court, and this court "review[s] a district court's decision regarding the constitutionality of a statute de novo." *United States v. Rose*, 522 F.3d 710, 716 (6th Cir. 2008).

#### B. Legal background

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Supreme Court held that the Second Amendment protects the

individual "right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. The Court recognized that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. It explained, for example, that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id. Heller* later described such regulations as "permissible." *Id.* at 635.

Expanding on *Heller*, *Bruen* recognized that ordinary, law-abiding citizens have a similar right to carry handguns for self-defense outside the home. 597 U.S. at 10. *Bruen* held that a New York law requiring residents to show a "proper cause" to obtain a license to carry a handgun outside the home violated that right. *Id.* at 71. *Bruen* explained that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17. If a statute regulates conduct protected by the Second Amendment, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

As the Supreme Court has since explained, that second-step "analysis involves considering whether the challenged regulation is

consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024). The challenged regulation need only be "relevantly similar to laws that our tradition is understood to permit," and "[w]hy and how the regulations burden the right are central to this inquiry." *Id.* "[W]hen a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* In other words, the Supreme Court's precedents do not demand "a law trapped in amber"; "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* Concurring, Justice Barrett explained that "imposing a test that demands overly specific analogues has serious problems," including "forc[ing] 21st-century regulations to follow late-18th-century policy choices," and "assum[ing] that founding-era legislatures maximally exercised their power to regulate." *Id.* at 1925 (Barrett, J. concurring).

### C. Supreme Court and Sixth Circuit precedent foreclose Greely's constitutional challenge.

Greely's challenge to the constitutionality of § 922(o) is foreclosed by Supreme Court and this Court's precedent. *Heller* explained that it would be "startling" to think that "the National Firearms Act's

restrictions on machineguns . . . might be unconstitutional," and accepted as uncontroversial that "M-16 rifles and the like—may be banned." *Heller*, 554 U.S at 624, 627. This Court subsequently rejected a constitutional challenge to § 922(o) as "directly foreclosed by" *Heller*. *Hamblen*, 591 F.3d at 474. The Court explained that machineguns fall outside of Second Amendment protection because they are not typically possessed by law-abiding citizens for lawful purposes. *Id.* The Court ultimately held that the Second Amendment "does not authorize an unlicensed individual to possess unregistered machine guns for personal use." *Id.*

*Hamblen* is binding until this Court en banc or the Supreme Court overrules it. *United States v. Ferguson*, 868 F.3d 514, 515 (6th Cir. 2017) ("One panel of this court may not overrule the decision of another panel; only the en banc court or the United States Supreme Court may overrule the prior panel."). Greely's challenge is thus directly foreclosed by *Heller* and *Hamblen*.

Greely's attempts to elude that precedent all fail. First, Greely declares that "reliance on pre-*Bruen* cases for analysis . . . is unhelpful given the new Supreme Court jurisprudence." (Greely Br. 11–12.) *Bruen*,

however, did not address the type of firearms protected by the Second Amendment. It also cast doubt only on cases that applied means-end scrutiny *after* determining that the conduct at issue fell within the meaning of the Second Amendment. *See Bruen*, 597 U.S. at 19 (holding that only "means-end scrutiny" in the Second Amendment context is inappropriate and "one-step too many"). Without applying means-end scrutiny, *Heller*'s discussion of *Miller* and *Hamblen*'s holding described the type of firearms protected by the Second Amendment. *Bruen* approved of that first-step analysis as "consistent" with the Supreme Court's analytical approach. *Id.* Neither *Heller* nor *Hamblen* applied the means-end scrutiny *Bruen* repudiated to uphold the constitutionality of § 922(o).

Indeed, *Bruen*'s analysis was "[i]n keeping with" and "broadly consistent with *Heller*." *Bruen*, 597 U.S. at 17, 19. Nothing in *Bruen* cast doubt on *Hamblen*'s or *Heller*'s analysis. *Bruen* and *Rahimi* both cited and reaffirmed *Heller*'s recognition, relied upon by *Hamblen*, that "dangerous and unusual weapons" are excluded from Second Amendment protection. *Rahimi*, 144 S. Ct. at 1897; *Bruen*, 597 U.S. at 21, 47. Other circuits have continued to apply *Heller*'s machinegun analysis after

*Bruen*. *See, e.g.*, *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1195 (7th Cir. 2023) ("*Heller* itself stated that M16s are not among the Arms covered by the Second Amendment; they are instead a military weapon."), *Bianchi v. Brown*, 111 F.4th 438, 445, 459, 470 (4th Cir. 2024) (en banc).

Greely's reliance on another Supreme Court decision, *Caetano v. Massachusetts*, 577 U.S. 411 (2016), is misplaced. In *Caetano*, the Supreme Court reversed a Massachusetts decision upholding a state law banning stun guns. *Id.* at 412. Contrary to Greely's suggestion (Greely Br. 12), *Caetano* did not conclude that the stun guns were not dangerous and unusual. Instead, the Court remanded after determining that the state court applied the wrong legal standard. *Caetano*, 577 U.S. at 412 (explaining, contrary to state decision, that the Second Amendment can apply to arms not in existence at the time of the founding and arms not useful in warfare). Greely instead relies on Justice Alito's concurrence joined by another Justice suggesting that stun guns are not unusual. A concurrence, however, is not precedential. And on its own terms, Justice Alito's concurrence is of little help to Greely. Justice Alito found stun guns constitutionally protected because they were legal in 45 states and

"accepted as a legitimate means of self-defense across the country." *Id.* at 420 (Alito, J. concurring). The same is not true of machineguns, as explained below. Anyway, Justice Alito later in *Bruen* reaffirmed that the Court was not disturbing "anything" *Heller* "said about restrictions that may be imposed on the possession or carrying of guns," *Bruen*, 597 U.S. at 71 (Alito, J. concurring)—including *Heller*'s discussion of the federal prohibition on machineguns.

Put simply, nothing since *Heller* and *Hamblen* casts doubt on either case's machine-gun analysis. *Heller* and *Hamblen* thus remain binding. Greely's Second Amendment challenge fails on that basis alone.

### D. Section 922(o) is constitutional under the Second Amendment's text and this Nation's historical tradition.

Even if *Heller* and *Hamblen* could be disregarded, § 922(o) is constitutional under *Bruen*. First, a machinegun is not a type of weapon the Second Amendment protects. Second, regardless, regulating machinegun possession is consistent with this nation's historical tradition of regulating dangerous and unusual weapons.[1]

[1] Courts have not settled on how weapons prohibition should be analyzed under the *Bruen* two-step framework. *See, e.g.*, *Bevis*, 85 F.4th at 1198, *cert. denied*, *Harrel v. Raoul*, No. 23-1010, 2024 WL 3259606 (U.S. July

#### 1. Machineguns are not bearable arms protected by the Second Amendment.

The Second Amendment's text affirms that the right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.

*Heller* looked to the entirety of the Second Amendment's text and the role of militias. The Court explained that "the Second Amendment's operative clause" ("the right of the people to keep and bear Arms, shall not be infringed") "furthers the purpose announced in its preface" ("A well regulated Militia, being necessary to the security of a free State") by defining the type of weapons covered by the right. *Heller*, 554 U.S. at 625. Specifically, the Amendment protects only those weapons that "'men were expected to . . . bear[]'" when "'called for [militia] service,'" meaning weapons "'in common use at the time' for lawful purposes like self-defense." *Id.* at 624 (quoting *Miller*, 307 U.S. at 179). In sum, "the Second

2, 2024) ("There is no consensus on whether the common-use issue belongs at *Bruen* step one or *Bruen* step two."); *Bianchi*, 111 F.4th at 450–51; *United States v. Price*, 111 F.4th 392, 415 (4th Cir. 2024) (Quattlebaum, J. concurring). Out of caution, the United States addresses the machine-gun prohibition under both steps using the analysis set forth in *Bruen* and *Heller*.

Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625.

Machineguns are not typically possessed by law-abiding citizens for lawful purposes. "The machine gun was first widely used during World War I, where it 'demonstrated its murderously effective firepower over and over again.'" *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (quoting William Rosenau, Book Note, The Origins of the First Modern Weapon, TECH. REV., Jan. 1987, at 74 (reviewing John Ellis, The Social History of the Machine Gun (1986))). Like other machineguns, the M-16 was "originally designed for the U.S. military" and "originally manufactured almost exclusively for military use," Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652, 24655 (Apr. 26, 2022), and it is a standard issue automatic firearm for the military. *See Bianchi*, 111 F.4th at 454 (describing the development of the M-16). Within that context, Congress has considered machineguns to be "primarily weapons of war." S. Rep. No. 90-1501, at 28 (1968); *see Hollis v. Lynch*, 827 F.3d 436, 448–50 (5th Cir. 2016) (same).

But following World War I, machineguns "became popular during the interwar period 'with criminals, especially bootleggers.'" *Bianchi*, 111

F.4th at 454 (quoting David B. Kopel & Joseph G. S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 287 n.490 (2024)); *see also* Robert J. Spitzer, *Understanding Gun Law History After Bruen: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 63 (2023). At the same time, machineguns were unpopular with civilians and law enforcement. *See Bianchi*, 111 F.4th at 469 ("The Tommy gun was marketed to civilians and police forces with little success, in part due to its expense and lack of controllability." (citing Spitzer, *Understanding Gun Law History After Bruen: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. at 61–62)).

In response, Congress recognized that "there is no reason why anyone except a law officer should have a machine gun." S. Rep. No. 73-1444, at 2 (1934). The machinegun ban is "designed to deal with crime guns." 132 Cong. Rec. 9600 (1986) (Sen. Hatch). Machineguns are used by "law violator[s]," S. Rep. No. 73-1444, at 1 (1934); they are "used readily and efficiently by criminals or gangsters," H.R. Rep. No. 83-1337, at A395 (1954); they are "used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime,"

H.R. Rep. No. 99-495, at 4 (1986); and their "proliferation" undermines "protection of law enforcement officers," *id.* at 7.

Courts came to a similar conclusion. Machineguns are "quasi-suspect" weapons, *Staples v. United States*, 511 U.S. 600, 611–12 (1994), which are "likely to be used for criminal purposes," *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality). Machineguns thus generally fall "outside those categories [of weapons that have] traditionally . . . been widely accepted as lawful possessions." *See Staples*, 511 U.S. at 612. The law reflects that reality: machineguns are banned or regulated under federal law for private persons under § 922(o), and in 35 states along with the District of Columbia.[2]

---

[2] *See* Alaska Stat. § 11.61.200; Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(iii), 13-3102(A)(5); Cal. Penal Code § 32625(a); Colo. Rev. Stat. § 18-12-102; Del. Code tit. 11, § 1444(a)(5); D.C. Code § 22-4514(a); Fla. Stat. § 790.221(1); Ga. Code Ann. § 16-11-122; Haw. Rev. Stat. § 134-8(a); 720 Ill. Comp. Stat. 5/24-1(a)(7)(i); Ind. Code § 35-47-5-8; Iowa Code §§ 724.1(1)(a), 724.3; Kan. Stat. Ann. § 21-6301(a)(5); La. Stat. Ann. § 40:1752; Me. Rev. Stat. Ann. tit. 17-A, § 1051(1); Mass. Gen. Laws ch. 140, §§ 128, 131, 131M; Mich. Comp. Laws § 750.224(1)(a); Minn. Stat. § 609.67; Mo. Ann. Stat. § 571.020(6)(a); Neb. Rev. Stat. § 28-1203(1); Nev. Rev. Stat. § 202.350(1)(b); N.J. Stat. Ann. §§ 2C:39-5(a), 2C:58-5; N.Y. Penal Law § 265.02(3); N.C. Gen. Stat. § 14-409(b); N.D. Cent. Code § 62.1-05-01(1); Ohio Rev. Code Ann. §§ 2923.11(K), 2923.17; Or. Rev. Stat. § 166.272; 18 Pa. Stat. § 908; 11 R.I. Gen. Laws § 11-47-8(a); S.C. Code Ann. § 16-23-230; S.D. Codified Laws §§ 22-1-2, 22-14-6; Tenn. Code Ann. § 39-17-1302(a)(3); Tex. Penal Code Ann. § 46.05(a)(1)(B); Wash.

Because machineguns were developed for military use and not typically used for lawful purposes, they are not bearable arms within the meaning of the Second Amendment.

**2. Section 922(o) falls squarely within this Nation's historical regulation of weapons.**

Even if machineguns were bearable arms within the meaning of the Second Amendment, Congress's restriction on machinegun possession is consistent with a longstanding tradition of regulating and restricting dangerous and unusual weapons. *Heller*, citing numerous legal treatises and cases, recognized "the historical tradition of prohibiting the carrying of dangerous and unusual weapons." 554 U.S. at 627 (internal quotation marks omitted). That tradition supported the limitation in *Miller* and *Heller* that the Second Amendment thus protects "the sorts of weapons . . . in common use at the time." *Id.* (internal quotation marks omitted).

Greely does not dispute that the historical tradition described by *Heller* exists. He instead claims that § 922(o) falls outside that tradition

Rev. Code § 9.41.190(1)(a); W. Va. Code § 61-7-9; Wis. Stat. § 941.26. Some, but not all, of these state laws have exceptions or affirmative defenses for machineguns possessed in compliance with federal law. *See, e.g.*, Ga. Code Ann. § 16-11-122; La. Stat. § 40:1752; Me. Rev. Stat. Ann. tit. 17-A, § 1052; Mo. Ann. Stat. § 571.020(1)(6); Or. Rev. Stat. § 166.272(4).

in two main ways. Greely first asserts that machineguns are not "dangerous" or "unusual." He next claims § 922(o)'s ban on possession renders it too broad to fit a historical prohibition on carrying. Neither claim has merit.

First, machineguns are dangerous and unusual under the Second Amendment. To the government's knowledge, every court to address this question has reached that same conclusion. *See United States v. Berger*, No. 5:22-CR-00033, -- F. Supp. 3d --, 2024 WL 449247, at *7 (E.D. Pa. Feb. 6, 2024) (collecting cases). Greely offers little more than a bare statement to support his argument that machineguns are not dangerous. The dangerousness of machineguns is apparent and well recognized. Machineguns fire at rates significantly higher than other still-dangerous weapons, including semi-automatic firearms. *See Bevis*, 85 F.4th at 1196 ("The M16 has an automatic firing rate of 700 rounds per minute, while the AR-15 has a semiautomatic rate of 'only' 300 rounds per minute."). Congress understood that machineguns are a "law violator['s] . . . most dangerous weapon." S. Rep. No. 73-1444, at 1 (1934). The Supreme Court has also noted "the immense danger posed by machineguns." *United States v. O'Brien*, 560 U.S. 218, 230 (2010).

Machineguns are also unusual. Courts have used different metrics to determine unusualness in this context. *See Hollis*, 827 F.3d at 448–50 (describing that various methods courts have employed, including considering "raw number[s], percentage[s] and proportion[s], and jurisdiction-counting"). Those metrics all point to the conclusion that machineguns are not in common use. The record below is that there were 741,156 total registered machineguns in the United States in May 2021, including those possessed by law enforcement. But with law enforcement equipment excluded, that number falls to a maximum of 175,977 (as tallied in February 2016). As the district court recognized (R.244: Order, PageID.918), the number excluding law-enforcement and unregistered machineguns is the objectively relevant one to the inquiry of whether machines guns are weapons "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. The uncommon use of machineguns is reinforced when the number of registered machineguns is compared to the adult population in the United States: at most, only 0.68% of adults have a machinegun registered to them. (R.244: Order, PageID.918)

That number is far less than the "50 million large-capacity magazines" that the Second Circuit found sufficient to establish common use." *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015). It is also less than the "more than 8 million AR- and AK-platform semiautomatic rifles" "manufactured in or imported into the United States" that a vacated Fourth Circuit opinion considered sufficient to show common use. *Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016), *vacated on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017).

Justice Alito's concurrence in *Caetano* also cited the fact that "approximately 200,000 civilians owned stun guns." 577 U.S. at 420 (Alito, J. concurring). That number is still higher than the number of machineguns registered to lay citizens. Anyway, Justice Alito's concurrence, even if somehow precedential, does not create a per se rule. Nor did Justice Alito consider that fact alone dispositive. Instead, he noted that over 45 states allowed possession of stun guns and stun guns were "accepted as a legitimate means of self-defense across the country." *Id.* The same is not true for machineguns.

Some courts have criticized this statistical analysis method to determining common use. *See, e.g.*, *Bianchi*, 111 F.4th at 460–61 (arguing

that a "trivial counting exercise" disregards a weapon's utility and use "for the purpose of self-preservation" and whether the weapon is "disproportionate to achieving that end"). Greely likewise asserts that numerical analysis is improper, relying on the Seventh Circuit's analysis in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015). (Greely Br. 15.) But the standard the Seventh Circuit adopted instead is even less helpful to Greely. The Seventh Circuit looks to historical firearm analogues and whether such weapons were "used exclusively by the military." *Bevis*, 85 F.4th at 1198–99. And as *Bevis* recognized, machineguns are unusual under that rubric as well. *Id.* As noted above, the machinegun was developed for and has been used in warfare by the military. Under that analysis, § 922(o) fits this nation's legal tradition of regulating the possession of dangerous and unusual weapons.

Second, § 922(o)'s prohibition of possession does not render it dissimilar to this nation's "historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Heller*, 554 U.S. at 627. As an initial matter, even if Greely's argument had merit, his Second Amendment facial and as-applied challenge would fail because he was carrying a machinegun in his waistband. (R.214: Gov't Resp., PageID.750–51;

R.389: Greely PSR, PageID.1864.) Furthermore, the Supreme Court's precedents do not require a "dead ringer," an "identical" legal regime, or a "law trapped in amber." *Rahimi*, 144 S. Ct. at 1897–98. Indeed, *Rahimi* applied a similar legal tradition banning "riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land" to the modern-day prohibition on *possession* of a firearm by a person subject to a protection order in 18 U.S.C. § 922(g)(8). *Id.* at 1901 (alterations omitted).

Moreover, as the district court recognized, *Heller* singled out machineguns as validly restricted under the Second Amendment without regard to how those weapons are used (e.g. possessed, carried, etc.). 554 U.S. at 625; *see also Bruen*, 597 U.S. at 72 (Alito, J. concurring) (explaining that *Bruen* did not "decide anything about the kinds of weapons that people may possess" or "disturb[] anything that we said in *Heller* . . . about restrictions that may be imposed on the possession or carrying of guns"). Courts have rejected similar arguments to the one Greely makes, and this Court should, too. *See, e.g.*, *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown*

*Caliber Serial No. LW001804*, 822 F.3d 136, 143 (3d Cir. 2016); *see also Berger*, 2024 WL 449247, at *13 (collecting cases).

Section 922(o) is also consistent with a related "strong tradition of regulating excessively dangerous weapons." *Bianchi*, 111 F.4th at 446. Self-defense is the "central component" of the right to bear arms. *Heller*, 554 U.S. at 599 (emphasis omitted). The founding generation understood the right to self-defense as the right of "a citizen to 'repe[l] force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.'" *Id.* at 595 (quoting 1 Blackstone's Commentaries 145–146, n. 42 (1803)).

Firearms at the founding were generally useful for self-defense but due to technical limitations, could not singularly inflict significant or broad damage. *See* Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 Yale L.J. 99, 153–54 (2023). One significant exception was gunpowder, which in large quantities "could kill many people at once if ignited." *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 49 (1st Cir. 2024). "In response to this danger—which resulted from the accumulation of firepower disproportionate to the lawful purpose of individual self-

defense—a handful of American cities and states restricted the quantity of gunpowder that an individual could possess." *Bianchi*, 111 F.4th at 465 n.3 (collecting laws).

As technology improved and firearms became lethally effective, legislatures throughout the nineteenth century and onward responded by enacting laws regulating weapons thought to offer firepower disproportionate to use in self-defense. *Id.* at 466–70 & n.4 ("Indeed, over the course of the 19th century and into the early 20th century, nearly every single state would either regulate the carry of certain firearms or place severe restrictions on their possession." (collecting laws)). Machineguns followed the same pattern. As machineguns became available in the early twentieth century, their tremendous power to inflict damage disproportionate with any use for self-defense spurred similar regulation. *See id.* at 469.

Greely also attempts to impose a heightened requirement that the historical regulation be "distinctly similar" (Greely Br. 7) to survive the analogical analysis. But *Rahimi* made clear that there is no such heightened test. Instead, it applied without discussion the "relevantly similar" test. *See Rahimi*, 144 S. Ct. at 1898, 1901. Even the dissent in

*Rahimi* repeatedly invoked the "relevantly similar" standard, *id.* at 1933, 1938, 1941, despite explicitly concluding that § 922(g)(8) addressed a societal problem "that has persisted since the 18th century," *id.* at 1933 (Thomas, J., dissenting) (internal quotation marks omitted). Section 922(o) is consistent with "the principles that underpin our regulatory tradition." *Id.* at 1898.

Greely further argues that the district court improperly declined to hold an evidentiary hearing on whether machineguns are dangerous and unusual. He points to no authority requiring such an evidentiary hearing. Indeed, the authority points the opposite direction: Courts routinely have determined that machineguns and related weapons are dangerous and unusual without an evidentiary hearing. *See, e.g.*, *Hollis*, 827 F.3d at 449–51; *United States v. Cooperman*, No. 22-CR-146, 2023 WL 4762710, at *3 (N.D. Ill. July 26, 2023); *United States v. Simien*, 655 F. Supp. 3d 540, 553 (W.D. Tex. 2023). The district court had sufficient evidence to conclude that machineguns are dangerous and unusual.

The district court also did not err because Greely failed to identify any factual disputes. Greely's request indeed was conditional, asking for an evidentiary hearing "*[i]f* the [c]ourt finds that there is a factual

dispute." (R.209: Br. in Support, PageID.733 (emphasis added); *see also id.*, PageID.725 (requesting an evidentiary hearing "[t]o the extent that there is a factual dispute").) Greely even referred to "the government's own statistics" in an effort to support his argument. (*Id.*, PageID.732.)[3] The dispute below was not over the facts, but what conclusion should be drawn from them—whether machineguns are "dangerous and unusual" or not. The district court found no factual dispute and appropriately declined to grant an evidentiary hearing. *See United States v. Williams*, 113 F.4th 637, 662 (6th Cir. 2024) (relying on unobjected-to criminal record details in defendant's presentence report).

[3] Greely also wrote that "[t]he Government's lower numbers of people using machineguns is not reliable under the exhibits of the parties." (R.209: Br. in Support, PageID.732.) He repeats this phrase verbatim on appeal. (Greely Br. 19.) But he still fails to explain what precisely this means, and still offers no citation as a point of reference. Greely also cites no authority on appeal that an evidentiary hearing was warranted. In analogous contexts, bare assertions that disputes exist are insufficient. *Cf. United States v. Hazel*, 696 F.2d 473, 475 (6th Cir. 1983) ("[I]t is only when this prima facie showing has been made and the defendant has proven a 'colorable entitlement' to a dismissal for selective prosecution, that an evidentiary hearing should be held"); *United States v. Watkins*, 815 F. App'x 22, 26 (6th Cir. 2020) (holding district court did not abuse discretion in declining to grant a "perfunctory and unsupported request for an evidentiary hearing").

## II. Section 922(g)(1) Does Not Violate the Second Amendment.

This Court should also reject Branch's Second Amendment challenge to § 922(g)(1)'s prohibition on gun possession by felons. The district court properly denied Branch's constitutional challenge to § 922(g)(1). Branch's conduct is not covered by the plain text of the Second Amendment, and even if it were, § 922(g)(1) is consistent with the country's long history of punishing felons and disarming those who present a special threat of firearm misuse. Branch's arguments to the contrary are inconsistent with Supreme Court precedent and this Nation's longstanding traditions.

### A. Standard of review

Branch raised his constitutional challenge to § 922(g)(1) before the district court, and this Court reviews the constitutionality of a statute *de novo*. *Rose*, 522 F.3d at 716.

### B. Legal background

In *Heller*, the Supreme Court held that the Second Amendment protects the right of citizens to keep firearms in their homes for self-defense. 554 U.S. at 635. *Heller* clarified that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626.

And the Court said that "nothing in [its] opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons[.]" *Id.* at 626–27 & n.26. *Heller* later "describe[d]" those regulations as "permissible." *Id.* at 635.

Shortly after *Heller*, this Court held that § 922(g)(1) does not violate the Second Amendment. *United States v. Frazier*, 314 F. App'x 801, 807 (6th Cir. 2008). Two years later, this Court again affirmed § 922(g)(1)'s constitutionality, this time in a published decision, concluding that because the right granted in the Second Amendment "is not unlimited," and "in fact. . . is specifically limited in the case of felon prohibitions," "Congress's prohibition on felon possession of firearms is constitutional[.]" *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010).

*Bruen* did not suggest that prohibitions on the possession of firearms by felons are unconstitutional, nor did *Bruen* address felon-in-possession laws or other status-based gun restrictions, an important note emphasized in opinions joined by six justices. *See* 597 U.S. at 72 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully

possess a firearm."); *id.* (explaining that *Bruen* did not "disturb[] anything that [the Court] said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns." (citation omitted)); *id.* at 80–81 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating *Heller*'s assurances that felons can be dispossessed of firearms); *id.* at 129 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on" *Heller's* statements about felon-in-possession laws). Rather, *Bruen* "reiterate[d]" *Heller*'s "standard"; explained that its holding was "[i]n keeping with *Heller*"; and said it was "apply[ing]" the "test that [the Court] set forth in *Heller*[.]" *Id.* at 24, 26.

Although *Rahimi* did not involve § 922(g)(1) or the pertinent historical record, the Supreme Court observed with approval that *Heller* "stated that many [plenary] prohibitions, like those on the possession of firearms by felons and the mentally ill, are presumptively lawful." 144 S. Ct. at 1897 (citation and internal punctuation omitted).

In *United States v Williams*, this Court addressed the constitutionality of § 922(g)(1). 113 F.4th 637 (6th Cir. 2024). The panel first concluded that its pre-*Bruen* precedent was no longer good law

because "intervening Supreme Court precedent demands a different mode of analysis." *Id.* at 647–48. "*Bruen* requires a history-and-tradition analysis" that the Sixth Circuit had not yet conducted. *Id.* at 645. *Williams* recognized that its approach conflicted with the decisions of other circuits that relied upon the Supreme Court's repeated assurances that prohibitions on felon possession are presumptively lawful. *Id.* at 645–46 (citing *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024); *United States v. Gay*, 98 F.4th 843, 846–47 (7th Cir. 2024); *Vincent v. Garland*, 80 F.4th 1197, 1200–02 (10th Cir. 2023), *vacated*, No. 23-683, 2024 WL 3259668 (Mem.) (U.S. July 2, 2024)).[4]

At *Bruen*'s first step, *Williams* rejected the government's argument that the Second Amendment did not facially apply to felons. *Williams* concluded the term "the people" encompasses all American citizens,

---

[4] Other courts have also upheld the constitutionality of § 922(g)(1) post-*Rahimi*. *See United States v. Langston*, 110 F.4th 408, 420 (1st Cir. 2024) ("[T]he Supreme Court's majority opinion in *Rahimi*, joined by eight justices, once again identified prohibitions on the possession of firearms by felons as presumptively lawful."); *United States v. Moya*, No. 22-40714, 2024 WL 3723900, at *1 (5th Cir. Aug. 8, 2024) (continuing to apply prior precedent after *Rahimi*); *United States v. Lowe*, No. 22-13251, 2024 WL 3649527, at *2 (11th Cir. Aug. 5, 2024) ("*Rahimi* did not abrogate our prior precedent.").

including felons, and the Second Amendment thus presumptively protected Williams's conduct. *Id.* at 649.

The panel then proceeded to the second step of the *Bruen* analysis—whether the government's burden on that right, *i.e.*, § 922(g)(1), "is consistent with the principles underpinning our historical tradition of regulating firearms." *Id.* at 650. After an extensive review of English and early American history of the regulation of weapons and firearms, the panel concluded that it was in most applications. "This historical study reveals that governments in England and colonial America long disarmed groups that they deemed to be dangerous." *Id.* at 657. The Court therefore concluded that "our nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous." *Id.* As a result, the panel held that § 922(g)(1) was "constitutional as it applies to dangerous individuals," *i.e.*, constitutional on its face. *Id.*

The panel left the door open to as applied challenges. *Contra United States v. Jackson*, 110 F.4th 1120, 1125–26 (8th Cir. 2024). Based on its historical review, it concluded that "when the legislature disarms on a class-wide basis, individuals must have a reasonable opportunity to prove that they don't fit the class-wide generalization." *Williams*, 113

F.4th at 661. In the absence of an effective administrative remedy, that determination must be made by the courts. *Id.* at 660–61. "When a disarmament statute doesn't provide an administrative scheme for individualized exceptions, as-applied challenges provide a mechanism for courts to make individualized dangerous determinations." *Id.* at 661.

The panel recognized that, under *Heller*, the statute is "presumptively lawful," and presumptively lawful as applied. *Id.* at 663. To overcome that presumption, the defendant has the burden of showing he is not "dangerous." *Id.* "A person convicted of a crime is 'dangerous,' and can thus be disarmed, if he has committed (1) a crime 'against the body of another human being,' including (but not limited to) murder, rape, assault, and robbery, or (2) a crime that inherently poses a significant threat of danger, including (but not limited to) drug trafficking and burglary." *Id.* "A more difficult category involves crimes that pose no threat of physical danger, like mail fraud, tax fraud, or making false statements," but the court left that issue for another day. *Id.*

"[W]hen considering an individual's dangerousness, courts may evaluate a defendant's entire criminal record—not just the specific felony

underlying his section 922(g)(1) prosecution." *Id.* Because Williams had prior convictions for aggravated (armed) robbery, attempted murder, and possessing a firearm as a felon (during which he "agreed to stash a pistol that was used to murder a police officer"), he was deemed to be "dangerous," and his as-applied challenge to § 922(g)(1) was denied. *Id.* at 662. The Court said that any one of those convictions was sufficient to demonstrate dangerousness. *Id.*

*Williams* summarized its holdings as follows:

> [W]e hold today that § 922(g)(1) is constitutional on its face and as applied to dangerous people. Our nation's historical tradition confirms Heller's assumption that felon-in-possession laws are "presumptively lawful." The history reveals that legislatures may disarm groups of people, like felons, whom the legislature believes to be dangerous—so long as each member of that disarmed group has an opportunity to make an individualized showing that he himself is not actually dangerous.

*Id.* at 662–63.

### C. Section 922(g)(1) is constitutional under Sixth Circuit precedent.

*Williams* binds this panel. Under *Williams*, Branch cannot show that "there exists no set of circumstances under which [§ 922(g)(1)] would be valid," and § 922(g)(1) is facially constitutional. *Id.* Nor can Branch succeed on as-applied challenge by showing he is not dangerous. *Id.*

Branch has multiple felony convictions. (R.429: PSR, PageID.2271–72.) Although only 19 years old at the time of the offense, Branch already had three adult felony convictions for (1) selling a firearm to a felon, (2) carrying a concealed weapon, and (3) assault with a dangerous weapon. (*Id.*) Branch's prior conviction for assault with a dangerous weapon is the type of crime against a person that is sufficient on its own to establish dangerousness. *See Williams*, 113 F.4th at 662 (concluding that prior aggravated robbery conviction "alone is sufficient to conclude that [the defendant], if armed, presents a danger to others or the public"). The undisputed factual circumstances underlying Branch's convictions underscore his dangerousness.[5] At age 18, Branch approached a victim, demanded money, drew his firearm, took her money, and hit the victim multiple times in the face with the butt of his gun. (R.429: PSR, PageID.2272.) As the victim attempted to escape in her car, a bullet struck the center dashboard. (*Id.*) Congress undoubtedly intended to protect the public by disarming such a person, and that offense alone is sufficient to find dangerousness.

[5] A court can rely on undisputed facts in the presentence report. *Williams*, 113 F.4th at 662. Here, Branch made no objections to the final PSR. (R.429: PSR, PageID.2281.)

Branch's unfitness to possess a firearm is only magnified by his other criminal history and consistent refusal to abide by laws and social norms. As a juvenile, Branch was convicted of lying to a police officer and attempting to break and enter into a motor vehicle. (*Id.*, PageID.2270–71.) Then, Branch removed his electronic monitoring while on probation and fled the state, thus receiving an additional state conviction. (*Id.*, PageID.2272.) Branch is precisely the type of individual who presents a special danger with a firearm.

Moreover, Branch could lawfully be disarmed because he was still on probation for his prior crime. Courts have recognized that individuals still serving a sentence outside of prison may be lawfully disarmed. *See United States v. Moore*, 111 F.4th 266, 271–72 (3d Cir. 2024) (denying Second Amendment challenge to § 922(g)(1) because "convicts may be disarmed while serving their sentences on supervised release"); *Gay*, 98 F.4th at 847 ("[W]e conclude that parolees lack the same armament rights as free persons.").

Section 922(g)(1) is not only facially constitutional, it is constitutional as applied to Branch.

## III. The District Court's Sentence of Burnett was Proper and Reasonable.

Burnett raises a number of challenges to his sentence. First, he claims that the district court unconstitutionally applied a base offense level of 20 on the basis that Burnett was an unlawful drug user under 18 U.S.C. § 922(g)(3), and therefore a prohibited person at the time he committed the offense. U.S.S.G. § 2K2.1(a)(4)(B). He argues that the court unreasonably failed to consider mitigating factors about his background and misunderstood his role in the offense. He also argues that the sentence was too long considering the mitigating factors such as his age and lack of criminal history. This Court should decline to review some of his arguments either because he waived them or invited the alleged error. Regardless, none of his arguments have merit.

### A. Standard of review

This Court reviews criminal sentences under a deferential abuse of discretion standard for reasonableness. *Gall v. United States*, 552 U.S. 38, 41, 51 (2007). Procedural reasonableness concerns how the sentence was calculated. *United States v. Potts*, 947 F.3d 357, 364 (6th Cir. 2020). A sentence is procedurally unreasonable "when the district court wholly fails to address legitimate mitigating arguments raised by the

defendant." *United States v. Johns*, 65 F.4th 891, 893 (6th Cir. 2023). But "district courts need not engage in a formulaic point-by-point refutation of a defendant's mitigation arguments; the district court discharges its duty so long as it conduct[s] a meaningful sentencing hearing and truly consider[s] the defendant's arguments." *Id.* (internal quotation marks omitted). A district court also commits procedural error by "selecting a sentence based on clearly erroneous facts" or miscalculating the Guidelines range. *Gall*, 552 U.S. at 51.

Substantive reasonableness concerns the length of the sentence. *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). "A sentence is substantively unreasonable if the district court selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent 18 U.S.C. § 3553(a) factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Frei*, 995 F.3d 561, 567 (6th Cir. 2021) (internal quotation marks omitted). Sentences within the advisory sentencing range are presumptively reasonable. *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008) (en banc); *see Rita v. United States*, 551 U.S. 338, 347 (2007). The fact that this Court "might have reasonably concluded that a different sentence was appropriate is

insufficient to justify reversal of the district court." *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007) (quoting *Gall*, 552 U.S. at 51).

Ordinarily, this Court reviews a district court's factual findings for clear error and legal conclusions and mixed questions of law and fact *de novo*. *United States v. Schock*, 862 F.3d 563, 566–67 (6th Cir. 2017). But when a defendant argues for the first time on appeal that his sentence was procedurally unreasonable, a "plain error" standard applies. *Vonner*, 516 F.3d at 385–86. Under the plain error standard, an appellant must identify an "(1) error (2) that was obvious or clear, (3) that affected [his] substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.* at 386 (internal quotation marks omitted).

"That standard is even more deferential than the abuse of discretion yardstick" because the court "will reverse only in exceptional circumstances to correct obvious errors that would result in a miscarriage of justice." *United States v. Ramirez-Figueredo*, 33 F.4th 312, 318 (6th Cir. 2022) (internal quotation marks omitted). Put another way, an error satisfies the standard only where it is "so plain that the trial judge was

derelict in countenancing it." *Vonner*, 516 F.3d at 386 (citation omitted) (alterations omitted).

Although the Court "may review forfeited claims, which . . . were raised for the first time on appeal, for plain error, [it] may not review waived claims at all." *United States v. Jackson*, 995 F.3d 476, 484 (6th Cir. 2021) (internal quotation marks omitted). "A defendant waives a known claim by agree[ing] in open court with a judge's proposed course of conduct." *United States v. Hall*, 373 F. App'x 588, 592 (6th Cir. 2010) (internal quotation marks omitted).

Also, "a party may not generally complain on appeal of errors that he himself invited or provoked the court to commit." *United States v. Akridge*, 62 F.4th 258, 264 (6th Cir. 2023) (internal quotation marks and alterations omitted). A defendant invites error by providing "'an affirmative indication of agreement'" to a district court's decision that he later challenges. *United States v. Carter*, 89 F.4th 565, 569 (6th Cir. 2023) (quoting *United States v. Derringer*, 844 F. App'x 802, 810 (6th Cir. 2021)). The Court will "sometimes—albeit rarely—review invited errors to prevent 'manifest injustice.'" *Id.* at 568 (internal quotation marks omitted). That means this Court "will reverse an invited error only in

exceptional circumstances." *Akridge*, 62 F.4th at 264. The Court will "typically review an invited error when the government and the defendant are equally at fault and the defendant claims a violation of his constitutional rights." *Carter*, 89 F.4th at 570 (internal quotation marks omitted).

### B. Burnett waived his Second-Amendment challenge or invited the error he now claims.

The Court need not reach the constitutional issues Burnett raises because he either waived them or invited the alleged error. Burnett initially filed, but later withdrew, an objection that 18 U.S.C. § 922(g)(3) unconstitutionally infringed on his right to bear arms under the Second Amendment. At the sentencing hearing, Burnett's counsel confirmed that Burnett withdrew his objection, and affirmatively stated that the district court's guidelines calculations were accurate. (R.508: Burnett Sent. Tr., PageID.2597–98.) Then at the hearing's end, Burnett's counsel told the court, "[W]e have no objection to the sentence." (*Id.*, PageID.2608.) By withdrawing his guidelines objection and then stating "[t]he defense agrees" with the court's calculation (*id.*, PageID.2598), Burnett "agree[d] in open court with a judge's proposed course of conduct." *Hall*, 373 F.

App'x at 592. That agreement amounts to a waiver, and he cannot now raise the same argument that 18 U.S.C. § 922(g)(3) is unconstitutional.

At the very least, Burnett invited the error he now claims through his affirmative indication of agreement to the district court's guidelines calculation, which included the heightened base offense level due to his prohibited status. *Carter*, 89 F.4th at 569. This Court should thus decline to review his constitutional challenge because no manifest injustice would result. Defendant bears more fault than the government for failing to pursue his own objection, though he apparently recognized the issue. The absence of a manifest injustice is underscored by Burnett's admission on appeal that "the error was not plain when the court ruled." (Burnett Br. at 20–21.)

The Court should not review Burnett's constitutional challenge to 18 U.S.C. § 922(g)(3) because Burnett waived it. At a minimum, the Court should decline to review his argument because he invited the alleged error and no manifest injustice would result.

### C. The district court's application of the prohibited-person base offense level was not plain error.

Even if Burnett had not waived his Second Amendment challenge or invited error, it was not plain error to apply the base offense level

based on Barnett's unlawful-user status. As Burnett concedes, at least plain error review applies because Burnett did not pursue his objection that 18 U.S.C. § 922(d)(3) violated the Second Amendment before the district court. *United States v. Johnson*, 95 F.4th 404, 415 (6th Cir. 2024). This Court has not previously addressed the constitutionality of 18 U.S.C. § 922(g)(3). And, as the Fourth Circuit recently explained, the circuits have not "made much progress on the question," and courts more generally have yet to reach a "consensus." *United States v. Claybrooks*, 90 F.4th 248, 256 (4th Cir. 2024).

Burnett agrees that the district court did not plainly err but hopes that future opinions from this Court and the Supreme Court will make the error plain. (Burnett Br. 20–21.) *Rahimi*, issued after Burnett filed his brief, is of no help to Burnett. There, the Supreme Court held that 18 U.S.C. § 922(g)(8)'s prohibition on firearm possession by an individual subject to a domestic violence restraining order was constitutional. *Rahimi*, 144 S. Ct. at 1902. As noted, *Williams* concluded § 922(g)(1)—prohibiting felons from possessing firearms—is facially constitutional and made clear that at least dangerous people may be disarmed under

the Second Amendment. 113 F.4th at 657. If anything, *Rahimi* and *Williams* support § 922(g)(3)'s constitutionality, as explained below.

In sum, there is no basis to conclude that the district court plainly erred by applying a higher base offense level to Burnett as an unlawful drug user. *See Claybrooks*, 90 F.4th at 256 (holding "[t]here can be no plain error where neither this nor other circuits have resolved," among other things, whether § 922(g)(3) violates the Second Amendment); *see also United States v. Ramadan*, No. 22-1243, 2023 WL 6634293, at *2 (6th Cir. Oct. 12, 2023) (determining that plain error review to constitutional challenges to firearms statutes required "determin[ing] only whether the challenged statutes are obviously unconstitutional," not "whether they comply with *Bruen*'s mandate" (internal quotation marks omitted)).

Section 922(g)(3) is constitutional anyway as consistent with our nation's "historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. That regulation falls comfortably within the historically rooted principle that governments may disarm categories of persons whose possession of a firearm would endanger themselves or others. Consistent with that principle, an unlawful user of controlled substances may be

temporarily disarmed so long as he misuses illegal drugs. This prohibition is analogous to the historical traditions of disarming those who present a significant risk of firearm misuse, including the dangerous, the intoxicated, and the mentally ill.

From before the founding through the present, legislatures have disarmed individuals who could not be trusted with firearms. Those categories varied over the decades and centuries as legislatures responded to technological and societal change. It is clear from history that legislatures and Congress can make categorical determinations about individuals who present a special danger of misuse: "That *some* categorical limits are proper is part of the original meaning" of the Second Amendment. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010); *see also Williams*, 113 F.4th at 656–57. *Rahimi* likewise seemed to acknowledge the propriety of categorical determinations. 144 S. Ct. at 1901 (noting "we do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse").

**1. Dangerousness**

One such category of people is those deemed dangerous. As this Court has recognized, there is a historical tradition of disarming those whose possession of firearms would endanger themselves or others. *Williams*, 113 F.4th at 663. English law before the Founding allowed the disarmament of dangerous individuals. *See, e.g.*, 14 Car. 2, c. 3, § 13 (Eng.); Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130–32 (1994). An influential precursor to the Second Amendment recognized that legislatures could disarm individuals who posed "a real danger of public injury." 2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971).

Later sources recognized that legislatures could disarm individuals whose possession of firearms posed a public danger. Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 28–29 (1868). Consistent with those understandings, early American legislatures disarmed classes of individuals thought to present a special risk of firearm misuse. At the outbreak of the Revolutionary War, the Continental Congress recommended and most states enacted laws

disarming loyalists and others who refused to swear allegiance to the United States.[6] In 1787, Massachusetts required rebels who participated in Shays' rebellion to surrender their arms to obtain a pardon.[7]

Colonies and then States punished misuse of arms with forfeiting those arms. Early justice-of-the-peace manuals explained that the Statute of Northampton allowed justices of the peace to confiscate arms

[6] 4 Journals of the Continental Congress 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776); Act of Dec. 1775, The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive 193 (Charles J. Hoadly ed., 1890); Act of Sept. 20, 1777, ch. 40, § 20, Acts of the General Assembly of the State of New-Jersey 90 (1777); Act of 1777, ch. 6, § 9, 24 The State Records of North Carolina 89 (Walter Clark ed., 1905); Act of May 1, 1776, ch. 21, § 2, 5 Acts and Resolves, Public and Private, of the Province of Massachusetts Bay 480 (1886); Resolves of Apr. 6, 1776, 8 The Statutes at Large of Pennsylvania from 1682-1801, at 559-561 (1902); Act of 1776, 7 Records of the Colony of Rhode Island and Providence Plantations in New England 567 (John Russell Bartlett ed., 1862); Act of May 1777, ch. 3, 9 The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, at 282 (William Waller Hening ed., 1821).

[7] Act of Feb. 16, 1787, §§ 1-3, 1 Private and Special Statutes of the Commonwealth of Massachusetts 145-147 (1805).

of persons who spread fear or terror.[8] Some states codified those rules.[9] Later, states adopted surety statutes that required potentially irresponsible and dangerous individuals who carried firearms to post bond. *Bruen*, 597 U.S. at 55–56, n.23 (collecting statutes); *see also Rahimi*, 144 S. Ct. at 1899–1900.

In enacting § 922(g)(3), Congress responded to the danger presented by unlawful drug users and addicts possessing firearms. As the Supreme Court has recognized, "drugs and guns are a dangerous combination." *Smith v. United States*, 508 U.S. 223, 240 (1993). This Court similarly recognizes that drug trafficking "poses a danger to the community" and "often leads to violence." *Williams*, 113 F.4th at 659.

---

[8] *See, e.g.*, James Davis, The Office and Authority of a Justice of Peace 5 (1774) (N.C.); Joseph Greenleaf, An Abridgment of Burn's Justice of the Peace and Parish Officer 12–13 (1773) (Mass.); William Waller Hening, The New Virginia Justice 18 (1795) (Va.); Eliphalet Ladd, Burn's Abridgement, Or The American Justice 22-24 (2d ed. 1792) (N.H.); James Parker, Conductor Generalis 12 (1764) (N.J.); James Parker, Conductor Generalis 12 (Robert Hodge printing 1788) (N.Y.); James Parker, Conductor Generalis 11 (Robert Campbell printing 1792) (Pa.).

[9] *See* Act of Nov. 1, 1692, ch. 18, § 6, 1 Acts and Resolves of the Province of Massachusetts Bay 52–53 (1869); Act of June 14, 1701, ch. 7, 1 Laws of New Hampshire 679 (Albert Stillman Batchellor ed., 1904); Act of Nov. 27, 1786, ch. 21, A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force 33 (1794).

Congress adopted the disqualifications in § 922(g)(3) to "keep firearms away from the persons [it] classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976).

That determination is supported by a multitude of reasons. First, drug users may mishandle firearms or use them to commit crimes because of "drug-induced changes in physiological functions, cognitive ability, and mood." *Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J., concurring in part and concurring in the judgment). Marijuana intoxication, for example, can alter "perception of time," "decrease[] short-term memory," and "impair[] perception and motor skills." National Academies of Sciences, Engineering, and Medicine, The Health Effects of Cannabis and Cannabinoids: The Current State of Evidence and Recommendations for Research 53 (2017) (Health Effects).

Illegal drug users also "commit crime in order to obtain money to buy drugs," which creates a risk that firearms will used to commit those crimes. *Harmelin*, 501 U.S. at 1002 (Kennedy, J., concurring in part and concurring in the judgment). "[V]iolent crime may occur as part of the drug business or culture" because violence can result from drug disputes or attempted robberies. *See id.*

Armed drug users also present a danger to police officers. "[D]ue to the illegal nature of their activities, drug users and addicts would be more likely than other citizens to have hostile run-ins with law enforcement officers," which "threaten the safety" of the officers "when guns are involved." *United States v. Carter*, 750 F.3d 462, 469 (4th Cir. 2014) (citation omitted). Armed drug users are also more likely to present a danger to themselves as drug users, including marijuana users, pose a higher risk of suicide than ordinary citizens. *See* Health Effects 311.

Consistent with these risks, the "intent" of the federal prohibition is "to keep firearms out of the hands of presumptively risky people." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 113 n.6 (1983). The Supreme Court recognized these risks in upholding drug-testing requirements for federal jobs that required carrying a firearm. *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 664 (1989). The Court emphasized "the extraordinary safety . . . hazards that would attend the promotion of drug users to positions that require the carrying of firearms." *Id.* at 674.

Burnett's firearm possession presents the risk of harm that Congress feared. Burnett was a professed gang member. By his own

admission, he was a daily and heavy marijuana user. At that same time, Burnett engaged in unlawful and dangerous activity: Burnett was trafficking firearms and switches to gang members and others who in turn used that firepower to inflict violence in the community. At least because Burnett cannot show he was not dangerous, both his facial and as applied challenges should fail.

**2. Intoxication**

The historical tradition of disarming those who are especially likely to misuse firearms contains another instructive analogue: historical laws regulating alcohol abusers. The founding generation understood that intoxication from substance abuse renders people irresponsible and untrustworthy. Benjamin Franklin remarked that alcohol use left people "destitute of Reason." Nat'l Archives, Silence Dogood, No. 12, 10 Sept. 1722, https://perma.cc/8TVL-PJEG. Thomas Jefferson equated "drunkards" with other groups who "cannot take care of themselves." Nat'l Archives, Letter from Thomas Jefferson to Samuel Smith, 3 May 1823 (Jefferson Letter). Benjamin Rush, a signatory of the Declaration of Independence and a physician, understood drunkenness as a "temporary

fit of madness." Benjamin Rush, An Inquiry into the Effects of Ardent Spirits on the Mind and Body 6 (Richardson 1812).

Consistent with those concerns, legislatures took steps to separate firearms and alcohol. A 1655 Virginia law barred "shoot[ing] any guns at drinkeing [events]." 1 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia 401–02 (1823). A 1771 New York law banned firing guns during New Year's to "prevent[] the 'great Damages . . . frequently done on [those days] by persons . . . being often intoxicated with Liquor.'" *Heller*, 554 U.S. at 632 (quoting 5 Colonial Laws of New York 244-46 (1894)); *see also Rahimi*, 144 S. Ct. at 1897 ("At the founding, the bearing of arms was subject to regulations . . . to restrictions on gun use by drunken New Year's Eve revelers." (collecting authority)).

Numerous states also regulated firearm access for intoxicated militia members during this time period. *See, e.g.*, 2 Arthur Vollmer, U.S. Selective Serv. Sys., Military Obligation: The American Tradition, pt. 8, New Jersey, at 25–26 (1947) (1746 law disarming those who appeared "in [a]rms disguised in [l]iquor"); *id.* pt. 11, Pennsylvania, at 97 (1780 law disarming those "found drunk"). Because state laws conscripted most

men to the militia, the laws regulating access to firearms affected a considerable amount of the population. *See* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 509 (2004); *see also Miller*, 307 U.S. at 179 (recognizing that historical sources "show plainly enough that the Militia comprised all males physically capable of acting in concert for the common defense").

As firearms became less cumbersome and posed a greater risk when possessed by an intoxicated person, numerous states in the 19th century imposed criminal penalties on intoxicated individuals who possessed, used, or received firearms.[10] A Missouri Supreme Court decision found such laws consistent with the right to bear arms, highlighting the

[10] *See* Kan. Sess. Laws 25, ch.12 § 1 (1867) ("any person under the influence of intoxicating drink" may not "carr[y] on his person a pistol . . . or other deadly weapon"); 1878 Miss. Laws 175-76 § 2 (making it unlawful to sell pistols and certain other weapons to a "person intoxicated"); Mo. Rev. Stat. § 1274 (1879) (prohibiting carrying "any kind of firearms" "when intoxicated or under the influence of intoxicating drink"); 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329 § 3 ("It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver."); *see also* 1909 Id. Sess. Laws 6, no. 62, § 1 (making it a crime for "any person" to "have or carry" any "pistol, revolver, gun or any other deadly or dangerous weapon" when "intoxicated, or under the influence of intoxicating drinks").

"mischief" that may result "from an intoxicated person going abroad with firearms." *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).

Like alcohol use, controlled substance use poses a significant risk when paired with gun possession. Legislatures did not have to pass similar laws separating controlled substances and firearms until much later in American history because, unlike alcohol, drugs were not widely used as intoxicants, let alone made illegal, until the late 19th and early 20th centuries. *See* Erik Grant Luna, *Our Vietnam: The Prohibition Apocalypse*, 46 DePaul L. Rev. 483, 487 (1997) ("Despite unrestricted availability, narcotics addiction was a negligible phenomenon in the eighteenth and nineteenth centuries."); David F. Musto, Drugs in America: A Documentary History 183, 188–92 (NYU 2002); John Rublowsky, The Stoned Age: A History of Drugs in America 98 (1974) (noting that "almost no accounts or reports have come down to us of cannabis being used as an intoxicant during the period when the plant was widely cultivated as an agricultural commodity" in the 18th and 19th centuries). Prohibitions on narcotics, opioids, and marijuana accordingly did not emerge until the late 1800s and early 1900s. *See* Elizabeth Kelly Gray, Habit Forming: Drug Addiction in America, 1776-1914 25 (2023);

Richard J. Bonnie & Charles H. Whitebread, II, The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition, 56 Va. L. Rev. 971, 996, 1010 (1970). "Illegal drug trafficking is a largely modern crime." *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023).

Firearm regulations often followed prohibitions on drug use and possession. A number of states, for example, passed laws barring the sale of firearms or pistols to "drug addict[s]." 1931 Pa. Laws 499, no. 158, § 8; 47 Stat. 652, § 7 (1932); 1936 Ala. Laws 52, no. 82, § 8; *In re Rogers*, 66 P.2d 1237, 1238 (Cal. Dist. Ct. App. 1937); 1935 S.D. Sess. Laws 356, ch. 208, § 8; 1935 Wash. Sess. Laws 601, ch. 172, § 8. In addition to the federal prohibition in § 922(g)(3), most states "have restricted the right of habitual drug abusers or alcoholics to possess or carry firearms." *United States v. Yancey*, 621 F.3d 681, 684 (7th Cir. 2010) (collecting statutes).

Section 922(g)(3) and other laws like it are relevantly similar to the historical tradition of regulating firearm possession and alcohol usage. There is at least one shared "why": concern users of such substances lack control or inhibitions while intoxicated and therefore present a

significant danger to themselves and others by possessing a firearm. The sets of laws also share a similar "how": temporary prohibition of firearm possession during use.

Burnett argues that § 922(g)(3) is dissimilar to historical laws regulating alcohol use and firearm possession because those laws "barred carrying firearms only while under the influence." (Br. at 19 (citing *Daniels*, 77 F.4th at 344).) As an initial matter, *Daniels*'s method and reasoning has been seriously undermined by the Supreme Court's analysis and guidance in *Rahimi*. *Daniels* drew its analytical approach from the now-reversed panel opinion in *Rahimi* and therefore incorporated many of the methodological flaws that the Supreme Court identified in reversing that panel opinion. *See Daniels*, 77 F.4th at 344–55. *Daniels*'s approach conflicts with *Rahimi*'s focus on using historical context to identify a "principle that underpins the Second Amendment," and effectively demands a "historical twin" or a "law trapped in amber" of the sort that *Bruen* and *Rahimi* disclaimed. *Rahimi*, 144 S. Ct. at 1897.[11]

---

[11] After *Rahimi*, the Fifth Circuit again concluded that § 922(g)(3) was unconstitutional as applied to an occasional user of marijuana. *United States v. Connelly*, No. 23-50312, -- F.4th --, 2024 WL 3963874, at *10

Anyway, Burnett's argument is wrong on the merits. The prohibition on firearm possession only lasts as long as a person is regularly using a controlled substance. *Yancey*, 621 F.3d at 686; *see also United States v. Bowens*, 938 F.3d 790, 793 (6th Cir. 2019) (explaining that § 922(g)(3) requires proof that "the defendant took drugs with regularity, over an extended period of time, and *contemporaneously* with his purchase or possession of a firearm" (emphasis added) (internal quotation marks omitted)). And here, Burnett actually possessed a firearm while smoking marijuana. A video found on Burnett's phone showing him smoking marijuana while holding an assault rifle. (R.370: Gov.'s Resp. to Def.'s Obj. to Initial PSR, PageID.1811.) Moreover, he was a daily user while engaged in large scale switch and firearms trafficking: Burnett said he had used a gram of marijuana daily since 2017. (R. 355: Burnett PSR, PageID.1635.)

---

(5th Cir. Aug. 28, 2024). *Connelly*, however, repeats many of the methodological flaws of *Daniels* and its decision in *Rahimi*. Moreover, unlike Burnett, the defendant in *Connelly* was only an occasional user of marijuana who "at times smoke[d] marijuana as a sleep aid and for anxiety," and there was no evidence showing that she used contemporaneously with her firearm possession. *Id.* at ** 1, 10. Burnett does not fit that profile given his heavy and consistent marijuana usage and contemporaneous possession of a firearm.

Moreover, the prohibition on possession during regular controlled substance use reflects the additional fact that such drugs, unlike alcohol, are illegal to use. As a result, controlled substance use presents added concerns that alcohol use does not. *See Carter*, 750 F.3d at 467–70; *Harmelin*, 501 U.S. at 1002–03 (Kennedy, J., concurring in part and concurring in the judgment); *Yancey*, 621 F.3d at 686. Put simply, the fact that § 922(g)(3) has an additional "why" that impacts the "how" does not render analogy to historical alcohol and firearm regulation inappropriate. To conclude otherwise would create a "regulatory straightjacket" requiring a "dead ringer," a "law trapped in amber," or a "historical twin" in contravention of *Bruen* and *Rahimi*.

**3. Mental illness**

Legislative regulation of firearm possession by the "mentally ill" is also analogous to regulating firearm possession by unlawful substance users. The Supreme Court has consistently recognized that "longstanding prohibitions on the possession of firearms by . . . the mentally ill" are "presumptively lawful" and "permissible." *Heller*, 554 U.S. at 624–25 n.26, 635; *see also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring); *id.* at 129 (Breyer, J., dissenting); *McDonald v. City of*

*Chicago*, 561 U.S. 742, 786 (2010) (plurality); *id.* at 925 (Breyer, J., dissenting); *Rahimi*, 144 S. Ct. at 1902.

That recognition is amply supported by historical sources. "Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded . . . idiots [and] lunatics" from the right to possess firearms. Robert Dowlut, The Right to Arms: Does the Constitution or Predilection of Judges Reign?, 36 Okla. L. Rev. 65, 96 (1983). Eighteenth century law allowed "lunatic[s]" to be confined and have their property seized. *See* Carlton F.W. Larson, Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit, 60 Hastings L. J. 1371, 1377 (2009); 1788 N.Y. Laws Ch. 12 (allowing the state to seize the property of a "lunatic" until "he comes of his right mind" or his death, at which point the property is released to his next of kin); At least one circuit has determined that these laws are sufficiently analogous to facially uphold § 922(g)(3). *See United States v. Veasley*, 98 F.4th 906, 913–15 (8th Cir. 2024) (recounting history and collecting authority).

Outside the Second Amendment context, the Supreme Court has analogized drug addiction and mental illness. *See Robinson v. California*,

370 U.S. 660, 667 (1962). Other courts have recognized that firearm possession by drug abusers presents similar issues to possession by the mentally ill. "Obviously, mental illness and drug use are not the same thing. But there is an intuitive similarity because their behavioral effects overlap." *Veasley*, 98 F.4th at 912 (internal quotation marks omitted). As the Seventh Circuit explained, "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *Yancey*, 621 F.3d at 685; *United States v. Dugan*, 657 F.3d 998, 999–1000 (9th Cir. 2011) (similar). Section 922(g)(3) is thus relevantly similar in its purpose and method as historic laws disarming the mentally ill. The "why" or purpose of these laws is that those suffering from mental illness and drug abusers and addicts both may be irresponsible with firearms. The "how" is temporary disarmament of those individuals.

Again relying on *Daniels*, Burnett argues that unlawful drug use is more similar to alcohol use than mental illness. (Burnett Br. 19.) Even if that were true, as an initial matter, the fact that one analogue is more similar in some respects does not defeat the presence of another analogue. Moreover, nothing prevents a Court from analogizing a law to

two historical regulation regimes. *Rahimi* indeed did so, relying both on surety and "going armed laws" to uphold the constitutionality of § 922(g)(8) and over the dissent's objection. 144 S. Ct. at 1901; *contra id.* at 1944 (Thomas, J., dissenting) ("The question before us is whether a single historical law has both a comparable burden and justification as § 922(g)(8), not whether several laws can be cobbled together to qualify.").

Burnett also fails to grapple with historical understandings of the relationship between alcohol use and mental illness. The founding generation and generations after equated alcohol intoxication to mental illness. Rush described intoxication for example as a "temporary fit of madness." Rush, An Inquiry into the Effects of Ardent Spirits on the Mind and Body 6. Jefferson equated "drunkards" with others such as "maniacs." Nat'l Archives, Letter from Thomas Jefferson to Samuel Smith, 3 May 1823. Cooley later noted that that intoxication was "regarded as temporary insanity." Constitutional Limitations 599 n.1.

Historical regulation of firearm possession by those with mental illness is relevantly similar to the ban on possession by active users of drugs in § 922(g)(3).

* * *

In sum, there is a longstanding and well-established historical tradition supporting firearm regulation of individuals who posed a special danger of misusing a firearm. Unlawful users of controlled substances, like Burnett was, present a particular risk of danger to the public, if armed. Section 922(g)(3) and the numerous similar state laws are relevantly similar to historical laws regulating alcohol abusers and the mentally ill. Section 922(g)(3), therefore, does not violate the Second Amendment, and the district court did not err, let alone plainly err, in applying the base offense level for a prohibited person under U.S.S.G. § 2K2.1(a)(4)(B).

### D. The Court should decline to review Burnett's procedural-reasonableness challenge.

As explained below, the district court considered and addressed Burnett's arguments in favor of a variance. The Court, however, does not need to reach that question because Burnett affirmatively told the Court that it had addressed his arguments. Burnett, therefore, either waived the issue or invited the error he now claims, and the Court should decline review as no manifest injustice would result.

At the end of his sentencing hearing, Burnett informed the district court that it had adequately addressed his arguments. In response to the

district court's inquiry, Burnett's counsel said, "I think the Court has addressed all our arguments, and we have no objection to the sentence." (R.508: Burnett Sent Tr., PageID.2607–08.) This Court has applied the waiver and invited-error doctrines under materially the same circumstances. In *Carter*, the defendant responded in the affirmative when asked by the district court whether the court had "addressed on the record all non-frivolous arguments asserted." 89 F.4th at 567. The Court did not decide whether the district court adequately addressed the defendant's policy argument because he "either waived his right to bring this challenge or invited the alleged error, and no manifest injustice will result from declining to consider his challenge." *Id.* Like in *Carter*, Burnett's argument on appeal that the district court failed to address his mitigation arguments has either been waived or he invited the alleged error.

This is not an "exceptional case" in which "manifest injustice" would result without the Court's review. *Akridge*, 62 F.4th at 264. Burnett has not attempted to meet the burden of showing a manifest injustice. *Id.* The government is not equally at fault for the district court's alleged failure to address his arguments. As *Carter* explained, "it is not the

responsibility of one party to ensure that the arguments of another have been addressed." 89 F.4th at 570. Like the defendant's argument in *Carter*, Burnett's argument on this point neither alleges that his "constitutional rights have been violated" nor presents "a relatively easy and obvious Guidelines miscalculation." *Id.* (internal quotation marks, citation, and alteration omitted).

Burnett's argument that the district court failed to address his sentencing arguments either has been waived or should not be reviewed due to invited error.

### E. The district court accurately understood Burnett's part in the offense and considered mitigating arguments.

The district court committed no procedural error in sentencing Burnett. It properly calculated the guidelines range, considered the § 3553(a) factors including the circumstances of the offense, considered Burnett's mitigating arguments, and explained its sentence. Burnett's arguments that the sentence is procedurally unreasonable are at odds with the record.

Burnett first incorrectly argues that the district court "failed to respond to Burnett's arguments in mitigation that his age (he was 21 at

sentencing), his lack of criminal history, his background, and his post-arrest conduct called for a lower sentence." (Burnett Br. 8.) The district court not only considered and addressed Burnett's arguments, it also reduced his sentence based on some of them. At the sentencing hearing, the district court identified and considered the reasons that Barnett gave for a variance below the guidelines, including his age, the prevalence of gun violence in his childhood, his prior accident, and his lack of criminal record. (R.508: Burnett Sent Tr., PageID.2605.) The district court also noted the other facts "in his favor," like that Burnett earned a GED while detained in this case. (*Id.*) The court even lowered Burnett's sentence to reflect some of those mitigating facts such as his age and lack of criminal history. (*Id.*, PageID.2608.)

The district court ultimately weighed those mitigating facts against the circumstances of the offense and determined that a variance was inappropriate. (*Id.*, PageID.2605–06.) There is no need for "a formulaic point-by-point refutation" of every argument Burnett made, as he seems to demand. *Johns*, 65 F.4th at 893. The district court meaningfully considered and incorporated Burnett's arguments for a lower sentence. That was more than sufficient.

Burnett also incorrectly claims that the district court based its sentence on two clearly erroneous factual findings. Burnett first takes issue with the district court's statement that he "participated in the sophisticated part of the offense." (R.508: Burnett Sent Tr., PageID.2603–04.) That conclusion was not clear error, let alone plain error. The undisputed facts in the PSR describe Burnett's conduct. Serving as the catalysts for the entire conspiracy, Burnett and another bought illegal switches and firearms for distribution to others. Burnett does not contest that fact but instead quibbles with the district court's word choice. Contrary to Burnett's suggestion, the district court could properly consider Burnett's serious conduct and role in the conspiracy under the sentencing factors without applying a role enhancement under the guidelines.

Burnett next improperly equates sophistication with attempts to conceal the illegal conduct. Sourcing an illegal switch from outside the country surely takes more planning and preparation than simply possessing or reselling a switch once it arrives. And, Burnett and Bowman did try to conceal their conduct by using fake names on the switch packages. Burnett minimizes the difficulty of ordering goods

online from China. But Burnett and Bowman were purchasing an illegal and highly dangerous item, not a widely or easily available consumer good. It was neither clearly erroneous nor plain error for the district court to consider Burnett's serious conduct and heightened culpability.

Burnett next claims that the district court failed to understand his remorse and acceptance of responsibility. Burnett, however, misinterprets the district court's response to his statements that he made a "tragic mistake." The district court did not cast doubt on Burnett's remorsefulness after the fact. Instead, it highlighted the seriousness of the offense and Burnett's culpability in organizing the criminal scheme. The district court properly considered the circumstances of the offense to determine the need for deterrence even if Burnett accepted responsibility after being charged.

**F. Burnett's sentence was substantively reasonable.**

The district court made a reasoned decision after considering and weighing the sentencing factors. Burnett argues that his sentence is too long given his age, lack of criminal history, background, his motivation to help family, his remorse, and his rehabilitative efforts. But the court considered and addressed those arguments in reaching its decision. It

even granted a lower sentence based on some of those factors — Burnett's age and lack of criminal history—and determined that a low-guidelines range sentence was warranted. Burnett's belief that "that the district court should have balanced the § 3553(a) factors differently" is not only insufficient, but also "simply beyond the scope of [] appellate review." *United States v. West*, 962 F.3d 183, 191 (6th Cir. 2020) (internal quotation marks omitted).

Even if Burnett's argument were properly reviewable, he has not rebutted the presumption that the within-guidelines sentence was reasonable. The district court appropriately accorded significant weight to the seriousness of the offense Burnett committed. Burnett was the source of machineguns to gang members and others with a track record of shooting. Despite that danger to the public, Burnett sought to both personally profit and further the violent goals of his gang. It was far from unreasonable for the district court to heavily consider those facts in arriving at its sentence. The district court reasonably weighed the seriousness of the offense against certain aspects of Burnett's background, and even reduced the sentence to reflect Burnett's age and

lack of criminal history, to arrive at a sentence. There is "no license to second guess that determination" on appeal. *Johns*, 65 F.4th at 894.

Ultimately the court imposed a tailored, individualized sentence and explained its rationale. The court did not commit any error, let alone an abuse of discretion, in sentencing Burnett.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgments of the district court.

Respectfully submitted,

MARK A. TOTTEN
United States Attorney

Dated: September 30, 2024

*/s/John J. Schoettle*
JOHN J. SCHOETTLE
Assistant United States Attorney
P.O. Box 208
Grand Rapids, Michigan 49501-0208
(616) 456-2404

**CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2024, the foregoing document was electronically filed. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

I further certify that a copy of the foregoing document was mailed on this date to the opposing party if he/she was not registered to receive the document by the Court's electronic filing system.

/s/*John J. Schoettle*
JOHN J. SCHOETTLE
United States Attorney's Office
Post Office Box 208
Grand Rapids, MI 49501-0208
(616) 456-2404

**CERTIFICATE OF COMPLIANCE**

A word count of this brief was made using Office 365 and it contains 16,423 words. Pursuant to Rule 32(a)(7)(b), a principal brief may contain no more than 13,000 words. This brief, however, is a consolidated brief in response to three appellants' briefs. This brief responds to multiple issues raised in those appellants' briefs. Accordingly, concurrent with the filing of this consolidated brief, the government is filing a motion for leave to file a brief exceeding the word limit.

/s/*John J. Schoettle*

JOHN J. SCHOETTLE
United States Attorney's Office
Post Office Box 208
Grand Rapids, MI 49501-0208
(616) 456-2404

**DESIGNATION OF DISTRICT COURT DOCUMENTS**

| Description of Entry | Date | Record No. | Page ID |
|---|---|---|---|
| Docket Sheet | | N/A | N/A |
| Indictment | 10/04/2022 | 1 | 1-2 |
| Superseding Indictment | 01/10/2023 | 30 | 113-141 |
| Branch Motion to Dismiss | 03/02/2023 | 182 | 595-601 |
| Government's Response to Branch Motion to Dismiss | 03/20/2023 | 184 | 603-618 |
| Greely Motion to Dismiss | 04/03/2023 | 208 | 724 |
| Brief in Support of Motion to Dismiss | 04/03/2023 | 209 | 725-734 |
| Government's Response to Greely Motion to Dismiss | 04/28/2023 | 214 | 750-763 |
| Burnett Plea Agreement | 05/11/2023 | 222 | 806-814 |
| Burnett Minutes, Change of Plea | 05/22/2023 | 229 | 830 |
| Order Denying Branch Motion to Dismiss | 06/01/2023 | 243 | 907-911 |
| Order Denying Greely Motion to Dismiss | 06/01/2023 | 244 | 912-919 |
| Greely Plea Agreement | 06/14/2023 | 266 | 979-986 |
| Greely Report and Recommendation | 06/15/2023 | 267 | 987-988 |
| Branch Plea Agreement | 06/16/2023 | 276 | 998-1006 |
| Branch Minutes, Change of Plea | 06/21/2023 | 284 | 1016 |

| | | | |
|---|---|---|---|
| Burnett Presentence Report | 09/12/2023 | 355 | 1607-42 |
| Government's Sentencing Memo – Burnett | 09/18/2023 | 359 | 1692-96 |
| Burnett Sentencing Memorandum | 09/19/2023 | 360 | 1697-1711 |
| Burnett Objections to Presentence Report | 09/19/2023 | 361 | 1714-24 |
| Government's Response to Burnett's Objections to Presentence Report | 09/26/2023 | 370 | 1810-18 |
| Greely Presentence Report | 10/03/2023 | 389 | 1846-82 |
| Branch Presentence Report | 10/24/2023 | 429 | 2244-82 |
| Greely Minutes, Sentencing | 10/30/2023 | 451 | 2351 |
| Greely Judgment | 10/31/2023 | 453 | 2354-60 |
| Greely Notice of Appeal | 10/31/2023 | 456 | 2367 |
| Branch Minutes, Sentencing | 11/14/2023 | 475 | 2476 |
| Branch Judgment | 11/14/2023 | 476 | 2477-83 |
| Burnett Judgment | 11/16/2023 | 485 | 2514-20 |
| Branch Notice of Appeal | 11/21/2023 | 489 | 2528 |
| Burnett Notice of Appeal | 11/30/2023 | 503 | 2583 |
| Transcript – Burnett Sentencing (Hearing Date: 11/16/2023) | 12/13/2023 | 508 | 2592-2609 |